**NATIONAL LABOR RELATIONS BOARD v. OFFICE TOWEL SUPPLY CO., Inc.**

No. 99, Docket 22477.

United States Court of Appeals
Second Circuit.

Argued Dec. 10, 1952.

Decided Jan. 6, 1953.

George J. Bott, David P. Findling, A. Norman Somers, Bernard Dunau and Mary E. Williamson, Washington, D. C., for National Labor Relations Board.

Louis Borins and Isadore Snitzer, Buffalo, N. Y., for respondent.

Before AUGUSTUS N. HAND, CLARK and FRANK, Circuit Judges.

FRANK, Circuit Judge.

Mrs. Jenifer testified that, before her discharge, she had been engaged in activi-

ties directed to union organization. The Trial Examiner did not believe this testimony. In his report he said: "The undersigned is not convinced that prior to her discharge Jenifer engaged in any organizational efforts. Jenifer was not a persuasive witness and from the manner in which she testified and from her demeanor on the stand, the undersigned is unable to accord any weight to her testimony on purported concerted activities prior to her dismissal." On but one subject did the Examiner consider her corroborated, *i. e.,* that, during the recess period on August 18, she and several other employees had discussed employee dissatisfaction and they had then concluded that a union was needed. But the Examiner found that the company, when it discharged Mrs. Jenifer later the same day, knew nothing whatever of this discussion except that she had remarked, "This is a hell of a place to work. They expect one girl to do the work of five and a girl doesn't get time to go to the ladies' room."

Of McDonald, the company's president who fired Mrs. Jenifer, the Examiner said: He "testified that for some time prior to her discharge Jenifer had failed to cooperate with the efficiency engineers who were doing time studies in her department, and as a result on August 18, when Senn, his office manager reported to him that during the recess period Jenifer had expressed great dissatisfaction with the plant and her job, he decided upon her dismissal.[1] McDonald denied that at the time he had any knowledge of Jenifer's alleged sponsorship of a union movement * * * The respondent denied having any knowledge of Jenifer's desires or plans to organize the employees and McDonald, who testified in this connection, impressed the Trial Examiner as an honest and straightforward witness. This conclusion is based upon his demeanor and forthrightness on cross-examination as well as direct examination

1. The record shows that McDonald testified that her remark, "This is a hell of a place, etc.," was "the final combination of the reason I fired her." Asked what he meant by "combination," he replied, "Well, she was giving us pretty uphill work previous to that. * * * [The] combination and the crux of the whole thing was the fact that she outwardly expressed herself as to how she felt about what we were doing."

and his cooperation with the General Counsel throughout the extended cross-examination."

**1.** The weight to be given the findings of an Examiner, when he sees and hears the witnesses and when his findings turn on his views of their credibility, we have recently discussed at some length in N. L. R. B. v. Dinion Coil Co., 2 Cir., 201 F.2d 484. There we sustained the Board's decision, which rejected an employer's plausible explanation of a discharge, solely because (a) the Examiner disbelieved the oral testimony of the employer's executive as to that explanation and (b) the Examiner based that disbelief on that executive's demeanor while testifying. In line with our opinion in the Dinion Coil case and the exposition we there gave concerning the effect of "demeanor evidence," we take as established in the instant case the following facts:' (1) Mrs. Jenifer, before August 18, had not engaged in any protected activities. (2) On that date, she did discuss, with other employees, employee dissatisfaction and the need for a union. (3) In that discussion, she made the "hell-of-a-place-to-work" remark. (4) Later on the same day, McDonald learned of that remark, but he knew nothing more of the nature or contents of her discussion with the other employees. (5) Solely because of that remark, and her previous lack of cooperation with the efficiency engineers, he discharged her.

The Examiner concluded that the company had not violated the Act in discharging Mrs. Jenifer. The Board disagreed with the Examiner's legal conclusion but accepted his findings of fact.[2] On the basis of those facts, the Board, in its decision, concluded that Mrs. Jenifer "was discharged because she engaged in concerted activities." In reaching this conclusion, the Board held that the discussion between her and the other employees on August 18 "constituted concerted activity for mutual aid and protection within the meaning of § 7 of the Act [29 U.S.C.A. § 157]";

that Mrs. Jenifer's statement to the group "was itself a complaint against existing conditions, calculated to induce group action by the employees to correct agreements"; and that such activity by her was an "indispensable preliminary step to employee self-organization" and consequently enjoyed the protection accorded by the Act to concerted activity. The Board said, in this connection, "Any other view concerning Jenifer's discharge would permit an employer to frustrate concerted activity at its inchoate stage and make a mockery of the guarantees of Section 7 of the Act." On that basis, the Board found that she was discharged because she had engaged in concerted activity, and that therefore the discharge violated the Act, despite the fact that the company at the time of her discharge did not know Mrs. Jenifer had been thus engaged in such activity. Chairman Herzog dissented, saying: "I cannot believe that Jenifer's remarks constituted the sort of concerted activity which Congress intended this Board to protect." We agree with him.

**■** Doubtless an employee's remark, which otherwise would justify a discharge, may be made in a context of concerted activity with the result that the discharge of that employee for that remark is unlawful under the Act—provided the employer knows of that context at the time of the discharge, but not otherwise. We find it impossible to accept the Board's conclusion that here the employee was discharged "because" she "engaged in concerted activity," when the employer was wholly ignorant of that fact which the Board holds to be a cause of the discharge. Such a conclusion stretches too far the meaning of "because."

This case is unlike Cusano v. N. L. R. B., 3 Cir., 190 F.2d 898, where the company knew that the discharged employee had been engaged, before his discharge, in protected activity but attempted to justify the discharge on the ground of the company's belief that he had made a false statement about the company's profits. Although it

2. The Board in its brief filed in this court says that, although it reversed the Examiner's "legal conclusion," the "reversal did not turn on any question of credibility," and therefore "the examiner's conclusion has no independent significance."

happened that this belief was honest but mistaken, the court's decision (that the discharge was unlawful) did not turn on that fact. The court cited cases holding that, if an employer, having knowledge of the pertinent facts, violates the Act, his motives are irrelevant.

It is suggested that our decision, approving Chairman Herzog's views, will poke a large hole in the Act, since it will afford employers a good excuse for discharging employees by way of pretended ignorance of the fact that those employees were organizing a union or otherwise participating in protected conduct. But mere pretended ignorance will never serve as such an excuse. The crucial factor here is the Examiner's belief, grounded on "demeanor evidence," in the testimony of the employer's executive that he was entirely ignorant of the existence of any facts which, as a legal matter, constitute protected behavior.

We regard as in accord with our views the earlier but recent decision of the Board in Myers Products Corporation, 84 N.L. R.B. 32. There an employee, Bevan, at the time of his discharge, was in fact the spokesman for a group of employees which had been formed for their mutual protection. The employer discharged Bevan. The Trial Examiner found that the "management had no knowledge of the formation of the group when it discharged Bevan and his discharge had no connection with his membership in the group or the fact that he had been appointed as its spokesman," but that the discharge was occasioned by another matter which was not within the scope of protected activity. The Board adopted the Examiner's finding, saying: "The Trial Examiner found that the Respondent was not aware of the concerted activities of the polishers or that Bevan was acting as their spokesman. We agree. Furthermore, we are of the opinion that when Bevan asked for a raise, on the day of his discharge, there was nothing in the context of events to indicate that he was speaking in the capacity of a representative of his coworkers or that his employer believed or had reason to believe he was so acting. Accordingly, we find that Bevan was not discriminatorily discharged

within the meaning of Section 8[a](3) of the Act [29 U.S.C.A. § 158(a)(3)]."

2. The Board's opinion is somewhat ambiguous. Perhaps the Board intended to assign as a separate reason for its decision the fact that, since Mrs. Jenifer's remark (i. e., "This is a hell of a place, etc.") was addressed to other employees, it was, regardless of any other discussion, "itself a complaint against existing conditions of employment, calculated to induce group action by the employees to correct a grievance. Such activity by Jenifer was an 'indispensable preliminary step to employee self-organization' and therefore enjoyed the protection accorded to concerted activity under the Act. Any other view concerning Jenifer's discharge would permit an employer to frustrate concerted activity at its inchoate stage and make a mockery of the guarantees of Section 7 of the Act." If this is what the Board meant, we cannot agree. Such a doctrine would prevent an employer from discharging any employee who, in the presence of fellow-employees, expressed a severe condemnation of the employer's ways, because any such grousing, in and of itself, would be "calculated to induce group action by the employees to correct a grievance" and therefore amounts to "concerted activity at its inchoate stage." We think mere griping far too "inchoate," that an employee's complaint, if addressed to other employees, is not, without more, "the sort of activity which Congress intended this Board to protect."

Enforcement denied.

CLARK, Circuit Judge (dissenting).

This case presents an important issue of law, namely, whether the Labor Management Relations Act shall be construed to deny protection to unionizing activities until the employer is notified or otherwise learns of them. But I fear it tends to be submerged by irrelevances, such as the discussion of the inapposite case of N. L. R. B. v. Dinion Coil Co., 2 Cir., 201 F.2d 484, where a Board order was sustained on the facts, however apologetically. And a criticism of the Board's decision as "ambigu-

ous" as bringing in a second ground of decision seems to me to add a confusion hardly justified by the Board's own statement. For the topical first sentence of the Board's crucial paragraph shows the unitary character of the Board's argument, as the quotation in the footnote demonstrates;[1] in fact, the succinct and forceful statement is one which I should gladly adopt as showing the facts and the law of the case. Finally, there is a tendency to magnify the dissent, which I find quite ambiguous in its one sentence of explanation. For we cannot be sure whether the dissenting member was reaching an *ad hoc* conclusion on the particular facts or, as appears now to be assumed, was making an extensive and original ruling of law.

Here I would recall, though not overstress, the difference between the Board's function and our own. As the expert agency hearing and finding the facts, the Board has opportunity to achieve a beneficent resolution of troubled labor relations in a way not open to a court which can reverse only for errors of law. So here the Board or any of its members could take an attitude toward the assertive Jenifer not open to us as a matter of review.[2] But I do not stress this, because actually the Board (with the possible exception of the dissenting member) did not take this position. Both her corroborated testimony as to the recess discussion in question and the employer's testimony that he was ignorant of any unionization plans were accepted; this evidence is taken as the given datum for the opinion here that "concerted activity" is not protected when the employer is

ignorant of it. So the issue became a legal one which the Board resolved correctly in my judgment. And if the dissenting member also accepted those facts, I should then feel that he erred for the same reasons which I shall now adduce against my colleagues' decision herein.

That this is an extensive and unusual ruling, one which does, as the Board says, "permit an employer to frustrate concerted activity at its inchoate stage and make a mockery of the guarantees of Section 7 of the Act," seems to me clear. "Employees shall have the right to self-organization, to form, join, or assist labor organizations, * * *" and interference therewith or discouragement of union membership is an unfair labor practice on the part of an employer. §§ 7, 8(a) (1) and (3), 29 U.S. C. §§ 157, 158(a) (1) and (3). Nothing appears in the statute to make this right contingent upon notice to, or knowledge by, the employer of embryo attempts at organization. Elsewhere we have declined to read new terms into a statute so evenly balanced legislatively as was the Taft-Hartley Act. Rabouin v. N. L. R. B., 2 Cir., 195 F.2d 906, 912. I wonder why we do it here. Apparently it is only because the Trial Examiner found Jenifer unattractive, and the company president attractive. But that, I submit, discloses the hampering effect of the decision more starkly. All that an employer need to do to retain a free hand against developing unrest in his plant is to remain a gentleman and receive no reports of definite unionizing trends. And so goes one of the prime guarantees of the Act.

1. Restoring the unifying first sentence to its proper place, the paragraph reads: "We think it clear, as found by the Trial Examiner, that the group discussion between Jenifer and the other four employees, involving protests against working conditions and the need for unionization, constituted concerted activity for mutual aid and protection within the meaning of Section 7 of the Act. Jenifer's statement to the group was itself a complaint against existing conditions of employment, calculated to induce group action by the employees to correct a grievance. Such activity by Jenifer was an 'indispensable preliminary step to employee self-organization' and therefore enjoyed the protection accorded concerted activity under the Act. Any other view concerning Jenifer's discharge would permit an employer to frustrate concerted activity at its inchoate stage and make a mockery of the guarantees of Section 7 of the Act." [Footnote citations omitted.]

2. So the weight rested upon Myers Products Corp., 84 N.L.R.B. 32, appears to be a consequence of overlooking the difference between the Board's function and ours. That was no formal ruling of law; it was but an *ad hoc* decision on the facts which the Board should make.

Thus, as the opinion rather naively observes, this decision "will poke a large hole in the Act." Of course it does more than that. It will have a paralyzing trend on attempts at unionization. These can no longer grow and be nurtured from tender shoots to bloom; they must spring up full blown or hardly at all. In all the long disputes over both the Wagner and the Taft-Hartley Acts, I had supposed that both assumed to nurture and protect unionization.

I think we have uncovered no proper ground upon which to deny enforcement of the Board order.