**SOUTHERN OXYGEN CO., Inc.**

v.

**NATIONAL LABOR RELATIONS BOARD.**

**No. 6763.**

United States Court of Appeals
Fourth Circuit.

Argued June 3, 1954.

Decided June 14, 1954.

Ringgold Hart and Jo V. Morgan, Jr., Washington, D. C. (Roger J. Whiteford, Washington, D. C., on the brief), for petitioner.

Samuel M. Singer, Atty., National Labor Relations Board, Washington, D. C. (George J. Bott, Gen. Counsel, David P. ·Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, and John Francis Lawless, Atty., National Labor Relations Board, Washington, D. C., on the brief), for respondent.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

This is a petition filed by the Southern Oxygen Company, Inc., asking us to review and set aside an order of the National Labor Relations Board (hereinafter called the Board) entered against the Petitioner. We think the petition must be granted and the order must be set aside.

The proceedings below were before the Board upon a formal complaint based on a charge filed by the Truck Drivers and Helpers, Local 355, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL, charging that the Petitioner was engaging in unfair labor practices within the meaning of Section 8(a) (1) and (3), and Section 2(6) and (7) of the National Labor Relations Act, 29 U.S.C.A. §§ 158 (a) (1, 3), 152(6, 7) (hereinafter called the Act). The complaint alleged in substance that on or about February 11, 1953, the Petitioner discharged four employees, Cammarata, Nebel, Owens and Wild by name, because of their union activities and their concerted activities, and that by these and certain other activities the Petitioner had interfered, restrained and coerced its employees in the exercise of rights guaranteed them under said Act.

Petitioner admitted that the four employees were discharged but denied that any unfair labor practice was committed. Petitioner affirmatively alleged that the four men were discharged because of the putting into operation by Petitioner of a decentralization plan which permitted a reduction in number of drivers to the extent of four drivers, and because the four drivers who were discharged were the least desirable employees in their class on the basis of their prior records.

In his Intermediate Report, the Trial Examiner recommended that the Petitioner be absolved from the charge that the four drivers were discharged because of their union activities but he recommended a finding that they were discharged because they engaged in "concerted activities," protected by the Act.

The Board upheld the finding of the Trial Examiner that the discharge of the four drivers was motivated by their engaging in "concerted activities" within the meaning of the Act and that Petitioner thereby violated Section 8(a) (1) of the Act. The Board directed that the complaint be dismissed as to all other charges. The Board entered a broad order requiring the Petitioner to desist from various discriminative and coercive practices, to post a notice at its Bladensburg plant, and to reinstate the four drivers with reimbursement for loss of back pay.

Only two questions are before us: (1) Was there substantial evidence to support the Board's finding that there were here "concerted activities" protected by the Act; and (2) Was there substantial evidence to support the Board's finding that the discharge of the four drivers was motivated by their engaging in these "concerted activities."

The discharged drivers (Cammarata, Nebel, Owen and Wild) were four of the ten long-haul drivers, whose operations were based at Petitioner's main plant at Bladensburg. They operated out of this plant to Petitioner's various delivery plants and then returned to Bladensburg. Petitioner had had under consideration for a long time a decentralization plan which would put these long-haul drivers under the district managers in several states and it was thought that under this plan, fewer long-haul drivers would be needed and some of them could be discharged.

In November, 1952, the branch managers of Petitioner met with General Manager McMillan to discuss this plan. The consensus of opinion expressed at this meeting was that the decentralization plan was practicable, that it would result in an increased efficiency of delivery operations and in a substantial decrease of costs. McMillan decided to put this plan into operation on February 10, 1953.

Prior to the events here involved, it had been Petitioner's policy to reimburse the long-haul tractor-trailer drivers for their actual expenses while on the road. However, on January 23, 1953, by a memorandum distributed to each of the long-haul drivers, Petitioner limited the drivers' reimbursable expenses by restricting the number of meals which would be allowed on certain trips and by setting a maximum amount for each meal.

The long-haul drivers discussed the new policy among themselves and then went to complain to McMillan. McMillan was unable to see the men at that time but a meeting was arranged for the next day, January 24, 1953, which meeting was attended by virtually all of the long-haul drivers. During the meeting, Cammarata, Nebel, Owen and Wild complained that they could not get along on the new allowance. McMillan explained to the four drivers that the Company had to reduce expenses and asked for their cooperation. The meeting, however, terminated with the drivers still being dissatisfied. Although the drivers continued to disapprove of the new expense instructions, the record seems to disclose that they complied with the new instructions.

On the morning of Saturday, February 7, 1953, Personnel Manager Harris held the regular monthly meeting of the drivers, at which the new expense allowance policy was the topic of discussion. The drivers all objected to it. Cammarata, Nebel, Owen and Wild, it seems, were loud in their disapproval.

On February 9, 1953, Harris reported to McMillan that he had made no progress in resolving the long-haul drivers' expense allowance grievance at the meeting held on February 7. Harris told McMillan that the men, particularly Cammarata, Nebel, Owen and Wild, were dissatis-

fied. According to McMillan, it was then that he decided to put the decentralization plan into effect. McMillan testified, however, that before doing so, he "felt the only fair thing to do would be to give these drivers one good, solid last opportunity to explain to me, as man to man, why they could not go along with the Company on this expense matter." Accordingly, McMillan scheduled another meeting with the drivers for the next day, February 10.

At the meeting of February 10, McMillan explained to the drivers the necessity of reducing expenses. He then stated that if the drivers could show that the allowed expenses were insufficient, he would be glad to review the matter. McMillan then asked what other "troubles" there were. Cammarata asked why plant workers were paid higher overtime rates than drivers. Owen wanted to know why city drivers in New Jersey received more pay than the trailer drivers in Bladensburg. Wild found fault with the chains on his truck. Cammarata and Nebel complained that the new expense allowance system would cost them over $40 a month.

After this meeting, McMillan summoned Supervisor Bell and Personnel Manager Harris to his office for the purpose of determining whether it was practical to proceed with plan of decentralization. After some discussion of the lack of cooperation on the part of the drivers and the desirability of reducing expenses, McMillan decided to start a partial decentralization. It seems that it was first determined that only four truck-trailer units would be decentralized. Then, after a review of the records of all the drivers, Cammarata, Nebel, Owen and Wild were selected for discharge. The next day, February 11, discharge notices, effective immediately, were issued to Cammarata, Nebel, Owen and Wild.

■ On the first issue before us, though the question is not altogether free of doubt, we think the Board was correct in finding that the actions of the long-haul drivers here may fairly be said to fall within the class of "concerted activities" protected by the Act. True it is that before the discharges the long-haul drivers had perfected no formal organization, appointed no committee to represent them, designated no spokesman to act on their behalf and, at some of the meetings, had aired individual as well as group grievances.

On the other hand, as soon as the new expense-allowance policy was announced, the long-haul drivers met and discussed it among themselves and went, as a group, to complain about it to McMillan. Subsequently, this problem was discussed at three meetings between the drivers and at least one high official of Petitioner. At each of these meetings, the drivers steadfastly sought a modification of the new policy, which Petitioner, on the score of the economic necessity for the plan, declined to change. In thus presenting, on several occasions, their joint grievances over changes in conditions of employment, we think the drivers were engaged in "concerted activities" for the purpose of collective bargaining or other mutual aid or protection.

■ In Joanna Cotton Mills Co. v. National Labor Relations Board, 4 Cir., 176 F.2d 749, 752–753, Judge Parker, speaking for our Court, said:

"We agree that the 'concerted activities' protected by the Act are not limited to cases where the employees are acting through unions or are otherwise formally organized. It is sufficient that they are acting together for mutual aid or protection. * * * It is clear, however, that to be protected the purpose of the concerted activities must be the mutual aid or protection of the employees; and it is equally clear that the circulation and presentation of the petition here involved was for no such purpose, but was nothing more nor less than an effort on the part of Blakely to vent his spleen upon a supervisory employee whose rebuke

in the performance of duty had angered him."

See, also, National Labor Relations Board v. Moss Planing Mill Co., 4 Cir., 206 F.2d 557, 559; National Labor Relations Board v. J. I. Case Co., 8 Cir., 198 F.2d 919, 922, certiorari denied 345 U.S. 917, 73 S.Ct. 729, 97 L.Ed. 1351; National Labor Relations Board v. Kennametal, Inc., 3 Cir., 182 F.2d 817, 818–819; National Labor Relations Board v. Phoenix Life Insurance Co., 7 Cir., 167 F.2d 983, 988, certiorari denied 335 U.S. 845, 69 S.Ct. 68, 93 L.Ed. 395; National Labor Relations Board v. Schwartz, 5 Cir., 146 F.2d 773, 774; Carter Carburetor Corporation v. National Labor Relations Board, 8 Cir., 140 F.2d 714. In National Labor Relations Board v. Westinghouse Electric Corporation, 6 Cir., 179 F.2d 507, 509, (upon which Petitioner relies), the Court was careful to state: "There was no concerted action in this respect. The activity which came to the foreman's attention was entirely the result of individual concern."

■ We think, after a careful review of the record, that there is no substantial evidence to sustain the Board's finding that, in discharging these four drivers, Petitioner was motivated by the fact that they engaged in the "concerted activities" which the Act protects.

There is nothing to show that Petitioner's plan of decentralization was not real, that it was not conceived upon a basis of increased efficiency and decreased costs, or that, when put into effect, it would not permit a reduction in the number of long-haul drivers required. See, Mount Hope Finishing Co. v. National Labor Relations Board, 4 Cir., 1954, 211 F.2d 365.

We think the Board has unduly stressed the admissions of Petitioner's officers. These admissions, as we read them, do show that in deciding which drivers were to be discharged, Petitioner, in going over the records of its long-haul drivers, did give some consideration to the question of which drivers had shown a clear tendency to cooperate with Petitioner and those who were open and militant trouble makers. But this hardly shows that the four drivers selected for discharge were chosen because they had actively engaged in "concerted activities." Surely, if for valid reasons of economy and efficiency, it should appear that Petitioner could let four drivers go, it could not be said that Petitioner could not validly and lawfully discharge any of these long-haul drivers. Merely by participating in these "concerted activities," all ten of these drivers did not secure immunity from discharge—a discharge prompted by considerations utterly disconnected with, and entirely apart from, these "concerted activities." Nor would it be proper to conclude that Petitioner fixed the number of drivers to be discharged at four, with the idea that it could thereby get rid of Cammarata, Wild, Owen and Nebel. There was no substantial evidence to contradict Petitioner's contention that it *first* decided it could dispense with four long-haul drivers and later picked the four drivers to be discharged on the basis of their prior records as the least desirable employees in their class.

The records of these four discharged drivers were certainly very bad and they furnished in themselves more than adequate grounds for discharge. Thus, as to Cammarata, the Trial Examiner conceded that Cammarata boasted of padding his expense accounts for meals, that he frequently took too long to complete his assignments, that he was put on probation for taking keys out of trucks in Richmond, that he once misstated his leaving time at Baltimore by two and one-half hours. There were further complaints against him for insubordination and abusive language.

As to Wild, the Trial Examiner conceded there was uncontradicted evidence that he deliberately padded his expense accounts, that when reprimanded for blocking a driveway in Richmond he was profane and insubordinate and that on twelve occasions during a two-months period he took excess time to complete his trips.

As to Owen, the Trial Examiner conceded there was uncontradicted evidence that he admitted to three people that he padded his accounts for meals, that he had wrongfully refused to unload his truck which brought forth a customer complaint, that he took excess time to complete his trip nine times during a two-months period.

As to Nebel, the Trial Examiner conceded that there was uncontradicted evidence that in ten instances during a three-months period he took too long to complete his assignments. McMillan, rightly or wrongly, was convinced that Nebel, too, was padding his expense accounts, partly because Nebel stated that the new limitations on his expense accounts for meals would take, each month, $44.00 out of his pocket.

It has frequently been held that when it becomes necessary, for valid economic reasons, to discharge a certain number out of a group, it is eminently proper to discharge those whose records disclose that they are the least efficient employees in the group. See, National Labor Relations Board v. Bretz Fuel Co., 4 Cir., 210 F.2d 392; Joanna Cotton Mills v. National Labor Relations Board, 4 Cir., 176 F.2d 749; National Labor Relations Board v. Draper Corporation, 4 Cir., 145 F.2d 199. As to dishonesty as a ground for discharge, see National Labor Relations Board v. Fansteel Metallurgical Corporation, 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627; Maryland Drydock Co. v. National Labor Relations Board, 4 Cir., 183 F.2d 538.

We think there is some force in Petitioner's contention that the real *gravamen* in the complaint was that these drivers had been discharged for union activities, and then, when both the Trial Examiner and the Board found no evidence whatever to sustain this, they, in order to force the reinstatement by Petitioner of the discharged drivers, fell back upon the much less serious charge (which we have found to be unsupported by substantial evidence) that the discharges had been motivated by the engaging of these employees in "concerted activities" protected by the Act.

For the reasons assigned, the petition of the Southern Oxygen Company will be granted. The order of the National Labor Relations Board is, accordingly, set aside.

Order set aside.