**HUGH H. WILSON CORPORATION,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 17418.

United States Court of Appeals Third Circuit.

Argued Jan. 24, 1969.

Decided July 3, 1969.

Rehearing Denied Oct. 7, 1969.

Thomas P. Schnitzler, Jackson, Lewis, Schnitzler & Krupman, New York City, (Robert Lewis, Allen B. Breslow, New York City, of counsel on the brief), for petitioner.

Lawrence J. Shermen, N. L. R. B., Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Elliott Moore, Atty., N.L.R.B., on the brief), for respondent.

Before McLAUGHLIN, KALODNER and STAHL, Circuit Judges.

## OPINION OF THE COURT

STAHL, Circuit Judge.

This appeal arises because of the discharge of two employees of petitioner, the Hugh H. Wilson Corporation, a manufacturer of hair curlers and bobby pins in Sunbury, Pennsylvania, after they had engaged in certain activities in response to the employer's announcement that instead of making contributions to the corporation's profit-sharing plan for the prior year 1966, the profits would be used for the purchase of new machinery and equipment. The ·employees, claiming they were discharged for engaging in protected concerted activities in violation of the National Labor Relations Act, filed unfair labor practice charges with the National Labor Relations Board.

Following several days of hearings, the trial examiner, in a well-reasoned

and well-documented decision,[1] approved by the Board,[2] upheld the unfair labor practice charges and ordered

(a) the reinstatement of one of the employees, Moll,

(b) certain payments to the estate of the other employee, Gibson,[3] and

(c) other affirmative action by the employer.

The petitioner-corporation seeks to set aside the Board order approving the decision of the trial examiner, contending, *inter alia*, that the employees were properly fired for cause and that they had not been engaged in concerted activities but rather had "acted individually and independently * * * reflecting solely their own views." (Petitioner's brief, p. 6). The Board has countered with a request for enforcement of its order.

It does not appear to be disputed that the subject matter of the discharged employees' protest, the company's profit-sharing plan, concerns a term or condition of employment. Nor is it contended that the activities of the employees, if concerted, were unlawful.

The trial examiner's decision adopted by the Board held that the petitioner was guilty of an unfair labor practice for interfering with employee conduct found to be concerted activity under § 7 of the National Labor Relations Act which provides, in pertinent part:

> Employees shall have the right * * * to engage in * * * concerted activities * * * for the purpose of * * * mutual aid and protection. 29 U.S.C.A. § 157.[4]

The lines defining this right have of necessity been painted with broad strokes. To protect concerted activities in full bloom, protection must necessarily be extended to "intended, contemplated or even referred to" group action, Mushroom Transportation Co. v. NLRB, 330 F.2d 683, 685 (3d Cir.1964), discussed further *infra*, lest employer retaliation destroy the bud of employee initiative aimed at bettering terms of employment and working conditions.

The mantle of protection of concerted activities, the various circuit courts have held,[5] extends to both union and nonunion employees.[6]

Section 7 of the Act is designed to guarantee to employees the fundamental right to present grievances to their employer to secure better terms and conditions of employment, even if

---

1. Appendix (App.) 6.

2. 171 N.L.R.B. No. 145, June 5, 1968.

3. Gibson died before the hearings were held. (App. 23.)

4. Section 8(a) (1) of the Act, 29 U.S.C.A. § 158, makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed" in § 7 of the Act.

5. Elam v. NLRB, 129 U.S.App.D.C. 388, 395 F.2d 611 (1968); Indiana Gear Works v. NLRB, 371 F.2d 273, 276 (7th Cir. 1967); NLRB v. Kearney & Trecker Corp., 237 F.2d 416, 420 (7th Cir. 1956); Southern Oxygen Co. v. NLRB, 213 F. 2d 738, 741 (4th Cir. 1954); Salt River Valley Water Users' Ass'n v. NLRB, 206 F.2d 325, 328 (9th Cir. 1953); NLRB v. J. I. Case Co., 198 F.2d 919, 922 (8th Cir. 1952), cert. denied, 345 U.S. 917, 73 S.Ct. 729, 97 L.Ed. 1351 (1953); Modern Motors, Inc. v. NLRB, 198 F.2d 925 (8th Cir. 1952); Joanna Cotton Mills Co. v.

NLRB, 176 F.2d 749, 752 (4th Cir. 1949); NLRB v. Phoenix Mut. Life Ins. Co., 167 F.2d 983, 988, 6 A.L.R.2d 408 (7th Cir.), cert. denied, 335 U.S. 845, 69 S.Ct. 68, 93 L.Ed. 395 (1948); and NLRB v. Schwartz, 146 F.2d 773, 774 (5th Cir. 1945).

6. Apparently petitioner's plant was not unionized.
   "The joining in protests or demands, even by a small group of employees, if in furtherance of their interests as such, is a concerted activity protected by the act. It is not necessary that union activity be involved or that collective bargaining be contemplated." Annot. 6 A.L.R.2d 416, 434 (1949).
   *See also* NLRB v. Western Meat Packers, Inc., 368 F.2d 65, 71 n. 13 (10th Cir. 1966); Annot., 19 A.L.R.2d 566 (1951). In Owens-Corning Fiberglass Corp. v. NLRB, 407 F.2d 1357, 1363 (4th Cir. 1969), the protest and concerted activity related to the lack of a company policy for quickly getting employees home in times of personal tragedy.

the presentation of a grievance requires a work stoppage: NLRB v. Washington Aluminum Co., 370 U.S. 9, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962); NLRB v. Serv-Air, Inc., 401 F.2d 363 (10th Cir.1968).

Although a single employees's encouragement of individual fellow workers to present grievances has not been protected, Indiana Gear Works v. NLRB, 371 F.2d 273 (7th Cir.1967); Mushroom Transportation Co. v. NLRB, *supra*; Joanna Cotton Mills Co. v. NLRB, 176 F.2d 749 (4th Cir.1959); Union Carbide Corp., 171 N.L.R.B. No. 199, 69 LRRM 1086 (1968), a single employee attempting to induce fellow workers to join in a petition regarding a common grievance is protected, Salt River Valley Users' Ass'n v. NLRB, 206 F.2d 325 (9th Cir. 1953); Joanna Cotton Mills Co. v. NLRB, *supra*, as is the right of an individual employee presenting grievances on behalf of others, NLRB v. Guernsey-Muskingum Elec. Co-op., Inc., 285 F.2d 8 (6th Cir.1960). Indeed, the Ninth Circuit, applying the Third Circuit test set out in Mushroom Transportation Co. v. NLRB, *supra,* held that a single nonunion employee's verbal support of a *threatened* strike by the union was protected and that the employee's discharge by the employer was an interference with his § 7 rights. Signal Oil and Gas Co. v. NLRB, 390 F.2d 338 (9th Cir. 1968). In Owens-Corning Fiberglass Corp. v. NLRB, 407 F.2d 1357, 1365 (4th Cir.1969), the court said:

> * * * The activity of a single employee in enlisting the support of his fellow employees for their mutual aid and protection is as much "concerted activity" as is ordinary group activity.

The one seldom exists without the other.

■ "Mere griping" about a condition of employment is not protected, but when the "griping" coalesces with expression inclined to produce group or representative action, the statute protects the activity: Mushroom Transportation Co. v. NLRB, *supra*. The stimulus which caused the coalescence of a grievance and concert of action may, of course, be initiated by the employee, but the coalescence may also be triggered by an action of or a failure to act by management.

In NLRB v. Washington Aluminum Co., *supra,* several employees had complained individually to management about the lack of heat in the plant. Management failed to remedy the situation. On an especially cold morning, several employees thought it was too cold to work. After a brief discussion among themselves, and without notifying any member of management who might be able to effect a remedy, the employees, in unison, walked out of the plant. Those who walked out were discharged. The walkout, the only concerted activity, was in response to a situation which management had failed to remedy; it was held by the Supreme Court to be protected under the Act.

In Modern Motors, Inc. v. NLRB, 198 F.2d 925 (8th Cir.1952), the protected activity was a refusal to go back to work. Indeed, the suggestion that the employees leave the premises came from the employer:[7]

> The concerted activities involved were prompted by the employer's fail-

7. See Elam v. NLRB, 129 U.S.App.D.C. 388, 395 F.2d 611 (1968), and Morrison-Knudsen Co. v. NLRB, 358 F.2d 411 (9th Cir. 1966), for similar factual situations and results. Hoover Design Corp. v. NLRB, 167 N.L.R.B. No. 62, enf'd, 402 F.2d 987 (6th Cir. 1968), involved an employee who generated protest and dissatisfaction among other employees because the employer reneged on a promise to give premium pay for a Thanksgiving holiday weekend. The employee's discharge was held to violate § 8(a) (1).

Also relevant is NLRB v. Kennametal, Inc., 182 F.2d 817, 818, 19 A.L.R.2d 562 (3d Cir. 1950):
* * * On January 31, 1947, seven or eight employees were gathered around a water fountain during working hours discussing a wage increase which had reportedly been won after a strike at a neighboring plant. Some one suggested that the group should immediately present its wage grievances to Philip McKenna, respondent's president. * * * Four days after the meeting * * *

ure at Christmas-time in 1949 to pay an employees' bonus, as had been done during a number of preceding years. On the morning following the Christmas holiday, eleven of the employees in the employer's shop insisted upon an opportunity to discuss the matter with the president of the Company. Two of their number acted as spokesmen for the group. The president declared that the Company could not afford to pay a bonus that year and directed all of them either to go back to work or leave the premises. The two spokesmen replied that they felt that they were entitled to seek legal advice. They left the shop and went downtown to find and consult with a lawyer. They suggested to the other nine that they not go back to work until their return. When the president came out into the shop a few minutes later and learned that the two spokesmen had left the premises, he announced that they were fired and ordered the rest to "go to work or get your tools and leave the building." All of the nine, except one, returned to their jobs. * * * When the two spokesmen came back * * * [all three were fired. The Board's order, including reinstatement and back pay for the three discharged employees, was enforced.] 198 F.2d 925–926.

■ The cohesiveness of the concerted activity need not be more than the suggestion of group action. In fact, the existence of a "group" need not be communicated to management, as asserted by petitioner in its brief (p. 39).[8] The Sixth Circuit has stated that, "the mere fact that the * * * [employees] did not formally choose a spokesman or that they did not go together to see * * * [management's representative] does not negative concert of action. It is sufficient to constitute concert of action if from all of the facts and circumstances in the case a reasonable inference can be drawn that the men involved considered that they had a grievance * * *." NLRB v. Guernsey-Muskingum Elec. Co-op., Inc., *supra* at 12.[9]

The grievance in *Guernsey* involved the appointment of Larry Miller, a son-in-law of a company executive, as foreman. His father-in-law announced the appointment to some of the employees as follows: "Now, Larry don't know a damn thing about it, but he is going to be your foreman." The other employees, who felt that one of their own number would be more qualified for the supervisory post, discussed the problem among themselves, and at various times each man in the crew went individually to complain to a management representative. The company's general manager

---

[with the president], respondent's officers decided to discharge * * * four men because they were leaders in the work stoppage. * * *

Judge Goodrich observed:
* * * What occurred * * * was certainly a concerted activity for the purpose of collective bargaining, the kind of activity which is expressly protected by Section 7 of the Act. That the employees suddenly dropped their tools and insisted upon presenting their grievances during working hours does not detract from the lawfulness of their conduct. * * * [Footnote omitted.] 182 F.2d at 819.

8. As the examiner found, and as we point out later, petitioner was sufficiently aware of the complaints of the lack of the profit-sharing contribution to charge it with

knowledge of the concerted activities found to be present in this case.

9. The quotation from the *Guernsey* case continues by stating the following prerequisite: "and decided among themselves, that they would take it up with management. * * *" 285 F.2d at 12.

In the *Washington Aluminum Co.* case, the Supreme Court has modified this requirement in the following manner:
We cannot agree that employees necessarily lose their right to engage in concerted activities under § 7 merely because they did not present a specific demand upon their employer to remedy a condition they find objectionable. The language of § 7 is broad enough to protect concerted activities whether they take place before, after, or at the same time such a demand is made. * * * 370 U.S. at 14, 82 S.Ct. at 1102.

was "damned unhappy" about the complaints of the employees so he fired one of them for "cause." This was held to be an unfair labor practice. Even though the employees had not communicated that a "group" had existed, and management may have inferred that it was dealing with individual gripes, the consensus of the affected, unhappy employees was sufficient to support a finding that the activity was in concert and, therefore, protected.

In short, the law recognizes that employees have a legitimate interest in "acting concertedly to make their views known to management without being discharged for that interest." NLRB v. Phoenix Mut. Life Ins. Co., 167 F.2d 983, 988 (7th Cir.), cert. denied, 335 U. S. 845, 69 S.Ct. 68, 93 L.Ed. 395 (1948); NLRB v. City Yellow Cab Co., 344 F.2d 575, 582 (6th Cir.1965).

As stated briefly in the opening part of the opinion, the events in this appeal began when the petitioner informed its employees that it was going to retool and invest in equipment and supplies so there would be little, if any, money payable as a contribution to the profit-sharing plan for the year 1966. This news was conveyed to the employees who are the subject of the unfair labor practice charge, as well as to others, by Bruce Minnier, tool room foreman. He had been instructed by management that when he distributed the profit sharing statements he was to make sure to get "across to the employees why there wasn't a contribution made." (App. 116.)

When Minnier spoke to tool room employees Moll and Gibson individually, they both complained (App. 66–67, 147–148, 164). In the presence of some other employees, Gibson loudly announced his dissatisfaction [10] to maintenance supervisor James Howard as the latter walked through the machine shop (App. 147–148, 152). Howard tried to explain to Gibson the reason for the company's action (Id.) Howard later reported the incident to Gibson's direct supervisor, Minnier (App. 181).

When some of the employees complained individually to Minnier about the profit-sharing plan, he told them there would be a meeting later in the afternoon to discuss "the whys and wherefores of the contribution this year." (App. 164). There is some disagreement between the parties as to whether Minnier decided to hold the meeting because of the complaints, or whether he had been initially instructed even before handing out the profit-sharing statements to hold a meeting, or whether his instructions were to have a meeting if it became necessary to do so in order to explain the company's action. (See NLRB brief, p. 3; petitioner's brief, p. 3 n. 1.) We do not believe this factual issue is crucial. Even if management had decided to call the meeting in the first place, the protests about the profit-sharing plan which preceded and followed it, and the questions raised and suggestions made at the meeting, are sufficient in our view to fit in the mold of "group action," which is considered to be an element of concerted activities under § 7: Mushroom Transportation Co. v. NLRB, *supra* at 685.

At the meeting Minnier again explained why there was to be little or no contribution to the profit-sharing plan. After Minnier made his remarks, he solicited comments from those present. One employee, William Yoxheimer, expressed suspicion at the petitioner's failure to provide the employees with a copy of the profit-sharing plan and suggested that the company do so (App. 71, 165).

---

10. In Gibson's affidavit (General Counsel's Exhibit No. 5, App. 30), he said in connection with the profit-sharing plan: "Last year, in the 1965 period, we also got only a small sum so this was especially disturbing because in earlier years we had been getting about $900 each year."

More precisely, Gibson's profit-sharing record (General Counsel's Exhibit 7, App. 39) showed the company's contribution to and his interest in the profit-sharing plan in 1965 to be $238.86, with a high of $952.01 for 1963 and a prior low of $668.-51 for 1960.

Gibson concurred in this suggestion (App. 72–73). Another employee, Russell Haas, urged that the company make some contribution to the profit-sharing plan even if most of the profits were invested back into the company (App. 71, 165). Gibson and Moll expressed concurrence in this suggestion (App. 72, 208). Minnier's response to these points was "to have faith in the company." (App. 72).

Minnier then reported the events of the meeting to his superiors who, in turn, informed the president of petitioner-company, Miss Mary Pich (App. 116–118). When she was told that Gibson and Moll, while complaining about the profit-sharing plan, had made derogatory remarks about the company, President Pich asked to see their personnel files. In examining the files she discovered some adverse information about both employees.[11] Miss Pich then talked to counsel for the company and, after describing the situation, she was advised to dismiss Moll and Gibson (App. 134–135).[12]

The following morning, June 19, 1967, before the men were fired, employee Yoxheimer brought to the plant a clipping from the help wanted column of the local newspaper. It was an advertisement for a secretary which told about the company's "excellent benefits including an outstanding profit-sharing plan." Yoxheimer handed the clipping to Moll, who, in turn, handed it to Minnier, stating, "I'm going to put this with my profit-sharing statement so when I get in the office again and they bring up the profit-sharing plan up, why, I'll have it to show to Miss Lane [the personnel director]." (App. 91, 170.)[13] After reading the clipping, Minnier went directly to the personnel office (App. 77). As he did, Gibson came over to Moll and said, "Isn't that something." (App. 76–78).

At the end of the day, on June 19, 1967, Moll was fired. In a meeting held in the personnel office Minnier said to him, "Bill * * * since you are no longer satisfied here we are going to let you go." (App. 80, 171.)

Gibson was next. When he came to the personnel office, Minnier said, "Ed, we've been reviewing your feelings and since you aren't happy with the company we decided to leave you go." (App. 182.)[14]

---

11. Generally, Moll's personnel file disclosed prior warnings for horseplay, for absenteeism, and for "not attending to his job" by "socializing" with other employees. Gibson's file contained information about refusal to follow suggestions and orders of his supervisors, and wandering around the plant bothering other employees. (App. 158–162.)

12. The bona fides of petitioner's action in discharging the two employees is not directly relevant to a determination of their rights. In NLRB v. Western Meat Packers, Inc., 368 F.2d 65, 69 n. 9 (10th Cir. 1966), the court declared:

Even though a discharge is motivated by an employer's good faith belief that the employee has engaged in misconduct in the course of a protected activity, if the belief is erroneous, the discharge may be violative of § 8(a) (1) of the Act. National Labor Relations Board v. Burnup & Sims, 379 U.S. 21, 85 S. Ct. 171, 13 L.Ed.2d 1 (1964).

Whether or not the complaint concerning the profit-sharing plan was legitimate also is not material. As the court said in NLRB v. Halsey W. Taylor Co., 342 F.2d 406, 408 (6th Cir. 1965).

We are not concerned in this case with the merit or lack of merit of Weekley's grievance. But it is clear that Sec. 7 protects his right to utter it as a matter of concerted activity with other employees for mutual aid.

13. In prior testimony, Moll recalled the facts as follows: "When he gave me the profit-sharing statement I told him that I was going to put it in my tool box and save it for when Miss Lane brought the profit sharing up when we were at any sort of a *meeting*." (App. 77, 170.) (Emphasis added.)

14. Minnier's testimony as to what he said differs from plant manager Bidelspach's recollection of the conversation. Bidelspach testified that Minnier said, "Ed, since you aren't happy with this company and you aren't performing your work satisfactory we decided to call it quits with you." (App. 126).

Prior to their discharge on June 19, 1967, Moll had worked for the company for over 7 years and Gibson for 3½ years. Each had received periodic raises and had on occasion been complimented for his work (App. 82–83, 100, 125, 131–133, 196–200).

The day following the discharge of Moll and Gibson, the company called a special meeting of the other employees and informed them that the dismissals were due to the poor attitude and work performance of Moll and Gibson, and had nothing to do with their complaints about the profit-sharing plan. (App. 119–120.)

■■ We conclude upon an examination of the record that there was sufficient evidence to support the finding of the trial examiner that Moll and Gibson were discharged because of their activities in response to the profit-sharing announcement.[15] It may be that neither was an ideal[16] or even acceptable employee, but the policy and protection provided by the National Labor Relations Act does not allow the employer to substitute "good" reasons for "real" reasons when the purpose of the discharge is to retaliate for an employee's concerted activities. It is clear that the "real" stimulus for the discharges here was each employee's conduct in response to the lack of a contribution by the petitioner to the profit-sharing plan.

In NLRB v. Electric City Dyeing Co., 178 F.2d 980 (3d Cir. 1950), this court had occasion to rule on a comparable situation where the employer alleged that certain employees were discharged for unsatisfactory work whereas the Board made a finding, in which we concurred, that the dismissals were for union activity. Judge Goodrich, speaking for the court, said, 178 F.2d at 983:

Bernard Czankner seems to be the weakest of the helpers discharged. He was probably guilty of sloppy packing, and Heilig testified that he should have been discharged five months earlier. But for some time prior to the discharges, respondents had a list of over forty persons seeking employment, and we cannot say that the Board gave undue weight to the timing of the discharge, which closely followed Czankner's presence at the union meeting. Czankner's work apparently became intolerable only after he had joined the union. Cf. Agwilines, Inc. v. N.L.R.B., 5 Cir., 1936, 87 F.2d 146, 154. Moreover, *it matters not that for reasons apart from the union [concerted] activity an employee deserves summary discharge if as a fact the reason was union [concerted] activity.* Edward G. Budd Mfg. Co. v. N. L. R. B., 3 Cir., 1942, 138 F.2d 86, 90, certiorari denied, 1944, 321 U.S. 778, 64 S.Ct. 619, 88 L.Ed. 1071. (Emphasis added.)

We have reiterated this same principle in subsequent cases.

In NLRB v. Buitoni Foods Corp., 298 F.2d 169, 174 (3d Cir. 1962), we said:

We observe preliminarily that where, as here, *contradictory* reasons for the discharge of an employee are advanced, it is the responsibility of the Board to weigh the evidence and resolve the factual conflict. * * * There is clearly no obligation on the Board to accept at face value the reason advanced by the employer. The

15. Bidelspach testified that as soon as he heard that Moll and Gibson had made some derogatory remarks about the company in regard to the profit-sharing plan, he called for the personnel files and reported to President Pich. (App. 117.) Petitioner's counsel stipulated that President Pich had called him on Monday, June 19, and informed him of Moll's (and presumably Gibson's) personnel files and that they had made derogatory remarks regarding the profit-sharing plan. Counsel advised petitioner to fire the employees. (App. 134–135.)

16. The trial examiner observed:
In my disposition of this case I do not want to give the impression that I believe or find that Moll and Gibson were perfect employees devoid of any faults or shortcomings. I am sure that they had their deficiencies as do most employees. (App. 18 n. 13.)

concurrent existence of an otherwise valid reason for the discharge of an employee does not preclude a factual determination that his discharge was discriminatory if it appears from the preponderance of evidence, and the reasonable inferences drawn therefrom, that the discharge was in fact motivated by the employer's opposition to the employee's union activities. * * * 17

It should be noted that in *Buitoni*, there was alleged to be a "concurrent reason" for discharging the employee, viz., violence on the picket line, which the examiner and the Board did not entirely accept. In our case the claimed unsatisfactory work record was not even concurrent but had occurred well before the activities involved in this appeal.[18]

In its brief, petitioner contends that in order to constitute concerted activity

17. In a case involving a comparable provision of the Virgin Islands Labor Law, Virgin Islands Labor Union v. Caribe Constr. Co., 343 F.2d 364, 368 (3d Cir. 1965), in assessing the evidence presented before the Deputy Commissioner of Labor, we said:

All this would support an inference that a causal relationship existed between the abrupt dismissal of the men and their joining the Union [footnote omitted]. The Commissioner's "function was to determine the real reason for the discharges and whether the reasons given by the employer were mere pretexts. In so doing [he] has the right to consider circumstantial evidence and draw inferences therefrom as direct evidence is not always obtainable". * * * We do not, of course, intimate that the fact finder was required to draw the inference that the dismissals were the result of union activity, but only that such an inference was permissible on the evidence in the record. * * *

In a Sixth Circuit case, the court said: Respondent contends that he [the employee] was discharged for an accumulation of acts of irresponsibility, insubordination and inefficiency and not because of union activity.

In determining this question, we apply the well-settled rule that if Hetrick's discharge was motivated wholly or *even in part* by his union activity, it was illegal despite the existence of adequate cause for firing him. * * * [Emphasis added.] NLRB v. Barberton Plastics Products, Inc., 354 F.2d 66, 68 (6th Cir. 1965).

*See also* Reading & Bates, Inc. v. NLRB, 403 F.2d 9, 11 (5th Cir. 1968); Betts Baking Co. v. NLRB, 380 F.2d 199, 203 (10th Cir. 1967); Annot., 83 A.L.R.2d 532, 540 (1962).

In some cases the courts have found that the conduct of an employee was so improper that his discharge was justified in spite of the fact he was also engaged in protected activities: Cain's Coffee Co. v. NLRB, 404 F.2d 1172 (10th Cir.

1968); NLRB v. Red Top Cab & Baggage Co., 383 F.2d 547 (5th Cir. 1967); Southern Oxygen Co. v. NLRB, 213 F.2d 738 (4th Cir. 1954). In *Cain's Coffee* and *Red Top* the court refused to enforce the order of the Board because it concluded that the finding of anti-union motivation for the discharge was not supported by substantial evidence.

*Southern Oxygen* is clearly distinguishable. There, the employer, prior to the occurrence of any activities claimed to be protected, had announced a plan to decentralize operations requiring reduction in the work force. The four employees who were discharged had engaged in protected conduct but there was not sufficient evidence to show that the discharge stemmed from their concerted activities. It was found that the company's stated reason for the discharge, the reduction of the work force, was not colored by a desire to stifle the concerted activities in issue.

In the instant appeal, we believe there is substantial evidence in the record to support the Board"s determination that the petitioner's motivation for the discharge of Moll and Gibson was their disturbing protest against the failure of the company to contribute to the profit-sharing plan.

18. In NLRB v. Rubber Rolls, Inc., 388 F.2d 71, 74 (3d Cir. 1967), a union activity case, Judge Freedman reiterated the position of this circuit. An employer may not use a pretext " 'dredged up * * * from the bottom of the barrel * * * to cover up * * * the actual reason for the discharge, * * *' " when the real reason is protected activity.

In Hoover Design Corp. v. NLRB, 167 N.L.R.B. No. 62, enf'd, 402 F.2d 987 (6th Cir. 1968), the Board said:

* * * Of course the Company could have discharged Vogt at any time during his employment for poor attendance or for any other reason [the employee also had a drinking problem]

in violation of § 7 of the Act, this court has said that the employees' conduct must contemplate some sort of "group action," Mushroom Transportation Co. v. NLRB, *supra*, otherwise their protests are mere griping. In support of its claim that there was no group action here, petitioner has constructed a chart listing each statement by Moll and Gibson which could in any way be related to their "concerted activity" and has characterized each such statement as being an "individual gripe, comment or suggestion" and not "group action intended, contemplated or referred to." (Brief, pp. 30–32.)

We believe petitioner takes too narrow a view of each statement or act of the employees in isolation. It is the totality of their conduct, their complaints to Minnier and others prior to the meeting, their participation in the June 16 meeting in which certain suggestions and ideas were generated, the consternation which their remarks and behavior caused the petitioner's top management, and the post-discharge meeting with the other employees to explain what had happened, which supports the Board's conclusion that Moll and Gibson reflected a general dissatisfaction which manifested itself, however inartfully, in the desire to do something about the disappointing profit-sharing contribution which could adversely affect the employees' ultimate retirement benefits.

As previously indicated, at the meeting called by Minnier, the discharged employees, Moll and Gibson, not only continued their prior protest against the employer's decision with respect to the profit-sharing plan but also concurred in suggested remedies put forward by other employees. Although the meeting was called by management, it was no doubt called because of the general dissatisfaction anticipated from or expressed by the employees under Minnier's supervision. The vocalization of this dissatisfaction on behalf of the employees by Moll and Gibson and others constituted sufficient "group action" to come within the protected concerted activities under the statute.

In substance, the employees had a gripe. They assembled. They presented their grievance to management, represented at the meeting by Minnier. Standing alone, we believe this was concerted activity sufficient to shield Moll and Gibson from discharge as a result of their protests. Moreover, Moll's indication the day following the meeting that he wanted to show management the "want ad" given to him by Yoxheimer, and Minnier's immediate response by going to the personnel office, further reflects Moll's desire to act for himself and for the group of employees adversely affected with respect to the profit-sharing plan and reveals that the discharges were directly related to the concerted activity in which the employees were engaged.

Both parties in this appeal rely on Mushroom Transportation Co. v. NLRB, *supra*, where we said:

> It is not questioned that a conversation may constitute a concerted activity although it involves only a speaker and a listener, but to qualify as such, it must appear at the very least that it was engaged in with the object of initiating or inducing or preparing for group action or that it had some relation to group action in the interest of the employees.[19] 330 F.2d at 685.

---

but they could not legally discharge him for his concerted activities on the pay issue or discharge him under circumstances when Vogt's protected activity was the precipitating, proximate and material cause of the discharge.
* * *

19. The court continued:
This is not to say that preliminary discussions are disqualified as concerted activities merely because they have not resulted in organized action or in positive steps toward presenting demands. We recognize the validity of the argument that, inasmuch as almost any concerted activity for mutual aid and protection has to start with some kind of communication between individuals, it would come very near to nullifying the rights of organization and collective bargaining

We believe that the facts here meet and surpass the threshold of concerted activity test which *Mushroom* established.

It should be pointed out that a violation of the Act was not found in *Mushroom*. In that case, a part-time or "extra" nonunion employee, during work hours, advised other employees of their various "rights" under the existing collective bargaining contract which had been negotiated by the union for the full-time employees. There was no evidence in the case that any of the "grievances" involved a group of employees or that the discharged employee, Keeler, had any intention of forming any such group. In refusing to enforce the order of the Board, this court said:

> We look in vain for evidence that would support a finding that Keeler's talks with his fellow employees involved any effort on his or their part to initiate or promote any concerted action to do anything about the various matters as to which Keeler advised the men or to do anything about any complaints and grievances which they may have discussed with him. * * * 330 F.2d at 684–685.

In other words, we held that mere conversations between employees do not come "within the ambit of activities protected by the Act * * *." How different the *Mushroom* case is, then, from the facts at bar where the two discharged employees and others complained about the profit-sharing plan arrangement, and the employer found it necessary to hold two meetings to deal with the problem, in the first of which the discharged employees participated and helped to generate suggestions for dealing with their grievance. Certainly, as the Board suggests, this conduct comes at least within that part of the *Mushroom* test holding that "a conversation may constitute a concerted activity" if it appears "that it had some relation

to group action in the interest of the employees."

Two more points should be covered briefly on the prime issue of concerted activity. Petitioner contends that there must be a spokesman for the employees leading the call for group action, and that the employer must have knowledge that the employees are engaged in concerted action.

With respect to the "spokesman" question, NLRB v. Guernsey–Muskingum Elec. Co-op., Inc., *supra*, expressly held that there is no need for a formal selection of a spokesman. "It is sufficient to constitute concert of action if from all the facts and circumstances in the case a reasonable inference can be drawn that the men involved considered that they had a grievance and decided, among themselves, that they would take it up with management." 285 F.2d at 12.

■ Furthermore, a spokesman may be a voluntary one or a chosen representative. Here, it might be said that Moll and Gibson were volunteers in speaking and protesting for themselves and on behalf of other employees of petitioner.

■ With respect to knowledge of the concerted activity, it is difficult to believe that at the time the officers of the petitioner decided to effect the discharges they were unaware of the dissatisfaction pulsating in the plant, at least in the tool room, which the trial examiner properly held to constitute protected concerted activity.

Finally, petitioner has laid great stress on the fact that both Moll and Gibson indulged in considerable profanity in the course of their protests. The Supreme Court has held, and we apply the principle here, that in balancing the rights of the employer and the employees, as long as the activities engaged in are lawful and the character of the conduct is not *indefensible* in the context of the grievance involved, the employees

---

guaranteed by Section 7 of the Act if such communications are denied protection because of lack of fruition. However, that argument loses much of its

force when it appears from the conversations themselves that no group action of any kind is intended, contemplated, or even referred to. 330 F.2d at 685.

are protected under § 7 of the act: NLRB v. Washington Aluminum Co., *supra* at 17 of 370 U.S., 82 S.Ct. 1099, 8 L.Ed.2d 298. See generally, Falcon Plastics Division of B–D Laboratories, Inc. v. NLRB, 397 F.2d 965 (9th Cir. 1968).

■■■ We cannot agree that the measure of profanity in which the discharged employees indulged here was completely unusual and totally indefensible in the context of their claimed grievance.[20]

We have considered the other points raised by petitioner in the able and comprehensive brief of counsel and find them not to warrant any different result.[21]

From a review of the record as a whole we conclude that there is substantial evidence to support the findings of the trial examiner and the action of the Board in the relief which it has ordered.[22]

Petitioner's request to set aside the Board's order will be denied. The request of the Board for enforcement of its order will be granted.

KALODNER, Circuit Judge (dissenting).

I would deny the petition of the National Labor Relations Board for enforcement of its Order and grant the petition of the Hugh H. Wilson Corporation to set aside the Board's Order.

I would do so for the reason that the evidence establishes that the discharged employees were not engaged in protected "concerted activity" when they expressed their criticism of the employer's conduct unaccompanied by an indicated intention to initiate or promote any concerted action by their fellow employees.

The instant situation is clearly governed by Mushroom Transportation Company, Inc. v. National Labor Relations Board, 330 F.2d 683 (3 Cir. 1964).

---

20. In dealing with this particular issue, the trial examiner commented,

> .I have heard it said that with the possible exception of the Australians, Americans use more profanity and coarse langue in their day to day conversations than any other people in the world.
> It is common knowledge that some of the worst of this trait occurs among factory workers. Indeed, Minnier admitted that profanity was used throughout the machine shop. He further testified, incidently [sic] that Moll was no worse than other employees in this respect.
> * * *

App. 19.

While the recognition of the validity of what the trial examiner said may not rise to the dignity of judicial notice, we all know that factory workers tend not to be angelic and that the rough or sordid language of the street in a plant or a shop is not a normal cause for dismissal. *Cf.* Watts v. United States, 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed. 2d 664 (1969), where the Court said:

> * * * The language of the political arena, *like the language used in labor disputes*, see Linn v. United Plant Guard Workers of America, 383 U.S. 53, 58, [86 S.Ct. 657, 15 L.Ed.2d 582] (1966), is often vituperative, abusive and inexact. (Emphasis added.)

*Cf.* Owens-Corning Fiberglass Corp. v. NLRB, 407 F.2d 1357, 1365 (4th Cir. 1969), where misstatements of fact in a handbill distributed by one of the employees discharged for concerted activity were held insufficient to justify the firing.

21. In view of Gibson's death before the hearing, a question arose as to the admissibility of Moll's testimony and that of others with respect to what Gibson said or did. Petitioner contended the evidence was inadmissible as hearsay. We agree with the Board that while the testimony of Moll and others as to Gibson may have been hearsay, it was admissible as a well-recognized exception to the rule because the examiner was concerned not with the truth of what Gibson is alleged to have said but whether or not he actually said it. (NLRB brief, p. 12.)

22. In Reading & Bates, Inc. v. NLRB, 403 F.2d 9, 11 (5th Cir. 1968), the court said:

> * * * Our only inquiry is whether the Board's findings are founded on "substantial evidence", considering the record as a whole. Universal Camera Corp. v. NLRB, 1950, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.

There, the question presented was whether an employee's statements to his co-workers that "they were not getting what they were entitled to" under the existing contract constituted "concerted activity" protected by the National Labor Relations Act.

In answering that question in the negative we held that a conversation between employees is not protected by the Act as "concerted activity" merely because it relates to employees' interests and that it must at least have the object of initiating, inducing or preparing for group action or have some relation to group action in the interests of employees.

Our holding in *Mushroom* was subscribed to and applied in Indiana Gear Works v. National Labor Relations Board, 371 F.2d 273 (7 Cir. 1967) where enforcement was denied of the Board's Order which was premised on its finding that the employer had discharged an employee for allegedly engaging in "concerted activity".

In *Indiana Gear* the Court said at page 276:

"To support the Board's findings, there must be substantial evidence in the record that Packard was engaged in a concerted activity for the purpose of mutual aid or protection, and that the employer had knowledge of the concerted nature of the activity at the time it discharged the employee. Mushroom Transportation Company v. N. L. R. B., 3 Cir. (1964), 330 F.2d 683; N. L. R. B. v. Ford Radio & Mica Corp., 2 Cir. (1958), 258 F.2d 457; N. L. R. B. v. Office Towel Supply Co., Inc., 2 Cir. (1953), 201 F.2d 838. It has been held that a complaint or gripe by an employee is not a concerted activity, Mushroom Transportation Company v. N. L. R. B., supra, 330 F.2d at 685, even though addressed to other employees. N. L. R. B. v. Office Towel Supply Co., Inc., supra, 201 F.2d at 841."

The evidence in the instant case establishes that everything said by the discharged employees was no more than an expression of their dissatisfaction with respect to the employer's announcement that it would, for pressing financial reasons, be unable to make contributions to its profit-sharing plan for the year 1966. These expressions were nothing more than "griping" and could not by any stretch of the imagination be said to attain the dimension of an intention or attempt to initiate or promote concerted action by their fellow employees.

There is still another reason why the Board's petition for enforcement of its Order should be denied and that of the employer should be granted.

There was lacking in the instant case substantial evidence to support the trial examiner's finding that the employer had knowledge of any "concerted activity" on the part of the discharged employees. The finding that the employer had such knowledge is, as the employer contends in his brief, "at best, sheer speculation, wholly unwarranted."

It is settled that to constitute a violation of Section 8(a) (1) of the Act it is imperative the evidence must establish that the employer has knowledge of the concerted nature of the employee's activity. National Labor Relations Board v. Burnup & Sims, Inc., 379 U.S. 21, 23, 85 S.Ct. 171, 13 L.Ed.2d 1 (1964).

In conclusion, it must be said that the majority has not given effect to the teaching that

"Courts should be 'slow to overturn an administrative decision,' [National Labor Relations Board] v. Babcock & Wilcox Co., 351 U.S. 105, 112, [76 S.Ct. 679, 100 L.Ed. 975], but they are not left 'to "sheer acceptance" of the Board's conclusions,' Republic Aviation Corp. v. National Labor Relations Board, 324 U.S. 793, 803 [65 S.Ct. 982, 89 L.Ed. 1372.]"

and

"Courts must, * * * set aside Board decisions which rest on an 'erroneous legal foundation.' [National Labor Relations Board] v. Babcock &

Wilcox, Co., *supra*, [351 U.S. at 112–113, 76 S.Ct. 679]." National Labor Relations Board v. Brown, et al., 380 U.S. 278, 291, 292, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965).