**TRI–STATE TRUCK SERVICE, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 79–1611.**

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit Rule 12(6) on Jan. 10, 1980.

Decided Feb. 13, 1980.

David L. Robertson, Jeffrey J. Bernstein, Bogarad & Robertson, Paris, Pa., for petitioner.

Andrew F. Tranovich, Allison Beck, N. L. R. B., Washington, D. C., John S. Irving,

Gen. Counsel, John E. Higgings, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Eliott Moore, Deputy Associate Gen. Counsel, Washington, D. C., for respondent.

Before GIBBONS, ROSENN and GARTH, Circuit Judges.

## OPINION OF THE COURT

GARTH, Circuit Judge.

Petitioner Tri-State Truck Service, Inc. asks this court to review and set aside a National Labor Relations Board order which found that Tri-State had engaged in unfair labor practices in violation of section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), by discharging two of its employees, James McDonald and Thomas Kovach, and which ordered Tri-State to cease and desist from such unfair labor practices and to reinstate the employees with back pay. 241 NLRB No. 32. The Board cross-petitions for enforcement of its order. We find that the Board's conclusion that Tri-State violated the Act is not supported by substantial evidence on the record as a whole.[1] Therefore, we grant the petition for review and deny the Board's cross-petition for enforcement.

### I.

Tri-State is engaged in the business of selling fuel oil to businesses and private homes. It supplies more than half of the fuel oil sold in the West Virginia counties of Hancock and Brooke and in Washington County, Pennsylvania. Fuel oil deliveries are made by five permanent drivers employed by Tri-State.

During the work week which began on Monday, January 16, 1978, Tri-State was forced to suspend its regular operations for two days due to a heavy snowfall. On Tuesday of that week, prior to closing down early for the day, Tri-State's president, William Snow, informed all of the drivers, who had been gathered together in the garage, that they might have to work during the weekend in order to make deliveries which were cancelled due to the snow storm. It is uncontested that none of the employees made any comments with respect to Snow's statement; none of them protested; no one asked any questions pertaining to premium pay or any other condition of weekend work. *See* T.R. at 12–13, 25–26 (McDonald's testimony); T.R. at 73 (Kovach's testimony). Hearing no response, Snow returned to his office after speaking to the drivers.

The record contains no evidence that McDonald, Kovach or any of the other employees had any further conversation during the week with Snow or any other management official, in regard to weekend work.[2] There was evidence, however, that some of the employees had discussed the matter among themselves. McDonald and Kovach, who lived at McDonald's home, had several conversations to the effect that they should receive time and one-half for weekend work. In addition, they called David Howell, a fellow driver, who apparently shared their concern. But it bears repeating that there is no evidence in the record that any of these employees expressed these concerns to management or that management had any knowledge that any employees had met to discuss weekend work or any other work-related matter.

It was not until Saturday, January 21, 1978, that Tri-State's management, for the first time, heard anything about any claims for premium pay. Early Saturday morning, Snow instructed the fuel oil supervisor, Lipovitch, to call the drivers into work. Mc-

---

1. Tri-State also challenges the scope of the relief granted by the Board. It claims that it had made an unconditional offer of reinstatement to Thomas Kovach thereby cutting off its liability to him for back pay. In the view we take of the case, this point need not be reached.

2. Both McDonald and Kovach admit that they did not discuss weekend work with Snow at any time from and after the Tuesday meeting until the following Saturday. T.R. at 25 (McDonald); T.R. at 82 (Kovach).

Donald was the first driver called. He asked Lipovitch if he would receive time and one-half for working on Saturday. Lipovitch responded that McDonald had better talk to Snow, to whom he handed the telephone. When McDonald repeated his question to Snow, Snow explained that McDonald was not entitled to time and one-half pay because he had not yet worked forty hours in that week. McDonald responded that he would not work unless he received the premium rate. At that point, Snow warned McDonald that if he did not come in on Saturday, he need not come to work on the following Monday. Snow then terminated the conversation. Immediately after the phone call, McDonald told his wife and Kovach that he had been fired. On learning this, Kovach told McDonald that he would "stick with" him in his demand for premium pay. T.R. at 19–20.

Within an hour, Snow called Kovach. Kovach also asked if he would receive time and one-half pay for Saturday work. When Snow responded in the negative, Kovach told him that he was "sticking with" McDonald [3] and then asked if that meant he should not report for work on Monday. Snow responded that Kovach should draw his own conclusion. T.R. at 47, 62–63.

After these conversations, Snow waited until noon for McDonald and Kovach to report to work. When they did not arrive, their trucks were sent out with substitute drivers. Snow admitted, however, that had McDonald and Kovach reported to work later Saturday morning, they would have been reinstated.

McDonald's and Kovach's charges against Tri-State were tried before an Administrative Law Judge. The Law Judge found that McDonald and Kovach had been engaged in concerted activity related to their wages and working conditions, which was protected under the National Labor Relations Act.[4] Moreover, the Law Judge held that Tri-State had reason to know of this concerted activity when Kovach and Mc-

---

**3.** There is some dispute as to what point in the conversation this statement was made. Snow's testimony implies that Kovach said he would stick with McDonald only after Snow had warned Kovach against failing to work on Saturday. The Administrative Law Judge generally credited Snow's testimony, but in this instance he adopted the time sequence testified to by McDonald's wife, Kathy McDonald, who was not a party to the conversation, over that of Snow. A.L.J. Op. at 15. We question the propriety of this decision. However, even accepting the time sequence of the conversation as found by the Law Judge, we conclude that substantial evidence on the whole record does not support the conclusion that Snow *knew* that McDonald and Kovach were acting in concert. *See* pp. 70–72 *infra*.

**4.** Tri-State does not challenge the finding that Kovach and McDonald were engaged in a "concerted" activity. Our holding that Tri-State had no knowledge of the fact that Kovach and McDonald were acting in concert when it fired them, obviates the necessity of deciding whether their actions reached the level of "concerted" activities which are protected under the labor laws. We entertain considerable doubt as to whether that standard was met in this case.

In *Mushroom Transportation Company v. N. L. R. B.*, 330 F.2d 683, 685 (3d Cir. 1964), this court recognized that conversation alone could constitute a concerted activity. But we noted that a conversation which qualifies as concerted activity must be related to group action:

It is not questioned that a conversation may constitute a concerted activity although it involves only a speaker and a listener, but to qualify as such, it must appear at the very least that it was engaged in with the object of initiating or inducing or preparing for group action or that it had some relation to group action in the interest of the employees.

Here, the alleged concerted activities arose from the conversations among Kovach, McDonald and Howell in which they expressed their opposition to Saturday work without premium pay. While these conversations do indicate a concerted plan to request time and one-half, it is questionable whether they indicate a concerted intention to refuse to work unless premium pay was granted. Rather, there is no indication that when McDonald refused to work without premium pay in the face of a threatened discharge, he had any idea whether Kovach, or any of the other employees, would follow suit. It was only after McDonald's conversation with Snow that Kovach told McDonald that he would go along with him. Similarly, only *after* McDonald had spoken with Snow, did McDonald call Howell to find out what he would do. Thus, on this record, it appears that while the employees may have acted in concert in planning to ask for time and one-half, any decision refusing to work without it was made on an individual basis.

Donald were fired, because the Law Judge found that Snow knew the two employees lived together and that Kovach had specifically informed Snow that he was "sticking with" McDonald. Accordingly, the Law Judge concluded that Tri-State violated section 8(a)(1) of the Act when it fired the two employees. This conclusion was upheld by the Board.

We hold that the Board's determination that Tri-State knew that its employees were engaged in concerted activities which were protected under the Act, is not supported by substantial evidence based upon the whole record.

## II.

Section 7 of the National Labor Relations Act, 29 U.S.C. § 157, guarantees that "[e]mployees shall have the right to . . . engage in other concerted activities for the purpose of . . . mutual aid or protection . . . ." This guarantee is enforced through section 8(a)(1) which makes it "an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise" of section 7 rights.

■ But section 8(a)(1) does not taint every employer act which may impact upon employees' protected activities. Such a broad reading would effectively erase the word "unfair" from the statute. Thus, both the Supreme Court and this court have recognized that the question of whether an employer's act violates section 8(a)(1) depends on the employer's motive. *N. L. R. B. v. Brown*, 380 U.S. 278, 283, 85 S.Ct. 980, 983, 13 L.Ed.2d 839 (1965); *Edgewood Nursing Center, Inc. v. N. L. R. B.*, 581 F.2d 363, 368 (3d Cir. 1978). For an employer to have the requisite illicit motive, he must, of course, *know* of the employees' concerted activities; only then can the employer's actions be said to have been directed at restraining employee rights. The Supreme Court has described employer knowledge as an essential requirement of section 8(a)(1) violations:

In sum, *§ 8(a)(1) is violated if it is shown that the discharged employee was at the time engaged in a protected activity, that*

*the employer knew it was such*, that the basis of the discharge was an alleged act of misconduct in the course of that activity, and that the employee was not, in fact, guilty of that misconduct.

*N. L. R. B. v. Burnup & Sims, Inc.*, 379 U.S. 21, 23, 85 S.Ct. 171, 172, 13 L.Ed.2d 1 (1964) (emphasis added); *accord, Hugh H. Wilson Corp. v. N. L. R. B.*, 414 F.2d 1345, 1355 (3d Cir. 1969), *cert. denied*, 397 U.S. 935, 90 S.Ct. 943, 25 L.Ed.2d 115 (1970); *N. L. R. B. v. Buddies Supermarkets, Inc.*, 481 F.2d 714 (5th Cir. 1973). Thus, Tri-State's section 8(a)(1) violation must be predicated on a finding that Snow knew, or had reason to know, that McDonald and Kovach were engaged in concerted activity. We must therefore examine the record to determine whether there is substantial evidence to justify such a finding.

## III.

■ We are bound to enforce the Board's order if we find that its decision is supported by "substantial evidence on the record as a whole." *Universal Camera Corp. v. N. L. R. B.*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). The term substantial evidence has been variously defined, but in our view, one of the earlier statements remains the best: "Substantial evidence is more than a scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. N. L. R. B.*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938) (Hughes, C. J.); *see Consolo v. Federal Maritime Commission*, 383 U.S. 607, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966). Moreover, the evidence must be substantial in relation to the "whole record." "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. N. L. R. B.*, 340 U.S. at 488, 71 S.Ct. at 464. We therefore cannot accept the Board's conclusion unless it seems reasonable in light of all of the evidence in the case.

In this case, the Board's conclusion that Tri-State knew of its employees' concerted

activities does not meet that standard. Examination of the "whole record" reveals that the only conclusion which can reasonably be derived from the evidence is a conclusion contrary to that reached by the Board. It is uncontroverted that no employee brought up the subject of premium pay when Snow first mentioned the prospect of Saturday work. It is also uncontroverted that neither Snow nor any other Tri-State official was informed, at any time during the remainder of the week, of any employee sentiment requiring premium pay for Saturday work regardless of hours worked, despite the several alleged employee discussions on the subject. Therefore, the first inkling that Tri-State could have had, regarding a "concerted" request for premium pay for Saturday work, had to have been revealed in Snow's conversation with McDonald.

But all accounts of McDonald's telephone conversation with Snow belie this contention. McDonald testified that he asked Snow simply, "this is time and a half isn't it." T.R. at 19; *see id.* at 56 (Snow's testimony). McDonald made no demand on behalf of all of the drivers. Nor did McDonald inform Snow that other drivers supported his demand for premium pay and would also refuse to work without it. The only reasonable conclusion that Snow could have drawn from talking to McDonald was that McDonald was acting alone. Even after talking to McDonald, Snow would have been completely unaware of any group action which would rise to the level of "concerted" activity protected under the Act. *See N. L. R. B. v. Northern Metal Co.,* 440 F.2d 881 (3d Cir. 1971); *Mushroom Transportation Co. v. N. L. R. B.,* 330 F.2d 683 (3d Cir. 1964). At the most, Snow could only have been made aware of McDonald's "mere griping." *Id.*

The subsequent conversation that Snow had with Kovach contained nothing which could have reasonably changed Snow's perception of his employees' actions. It is significant that Kovach did not testify regarding this important conversation. The only accounts of what took place are found in Snow's testimony and in the testimony of Mrs. McDonald, who was in the room while Kovach was on the telephone with Snow. Both accounts indicate that, like McDonald, Kovach did not inform Snow of any group action. Kovach demanded time and one-half for himself only. He did not refer to activity by any group. He did not tell Snow that he or McDonald had communicated with all of the other drivers and that they would support his position. Kovach asked what would happen to *him* if *he* refused to report to work on Saturday. T.R. at 62. No mention was made of group action or group consequences. In short, as in McDonald's case, the evidence could only have led Snow to conclude that Kovach was pressing an individual claim.

Kovach did tell Snow that he was "sticking with" McDonald. The Administrative Law Judge specifically relied on that statement in concluding that Snow had knowledge of the concerted nature of McDonald's and Kovach's activities when he fired them. Snow's testimony, however, indicates that Kovach made this statement *after* it had been implied that Kovach would be fired for refusing to work on Saturday. If this were credited, then Snow could not be held to have known of the alleged concerted activity when he fired Kovach.[5] But the

---

5. The Board seeks to avoid this conclusion by arguing that Kovach and McDonald were not actually fired until later in the day when Snow actually gave up waiting for them. Under this analysis, Snow would have known of concerted activity when he fired Kovach and McDonald regardless of the sequence of the conversation.

We need not address the Board's argument in light of our holding that Kovach's statement, even if it occurred before he was fired, does not reveal that Snow knew of concerted actions. Nonetheless, it seems to us that the Board strains credulity when it argues that Kovach and McDonald were not fired until some arbitrary point after their telephone calls with Snow—*i. e.* until Snow finally decided to send out the trucks with replacement drivers. Suppose Kovach and McDonald had changed their minds and decided to report for work, but that they were delayed by the weather and did not arrive until after the trucks had been sent out. Under the Board's theory, their firing would turn solely on their unlucky misfortune. A more reasonable reading of the record would

Law Judge credited the testimony of Mrs. McDonald, who had overheard Kovach speaking on the telephone with Snow. According to Mrs. McDonald, Kovach told Snow that he was "sticking with" McDonald earlier in the conversation. Thus, the Law Judge found that Snow knew of the concerted activities when he fired Kovach. *See* note 3 *supra.*

We have serious doubts as to whether Mrs. McDonald's testimony as to Kovach's conversation with Snow was "adequate" to support the conclusions drawn by the Law Judge and the Board. *Consolidated Edison Co. v. N. L. R. B., supra.* Clearly, on the basis of the whole record, more credence should be given to the testimony of a party to the conversation than to someone who claims to have overheard one half of the conversation. But even assuming the facts as the Law Judge found them—that before Snow fired Kovach, Kovach had told Snow that he was "sticking with" McDonald—we do not believe that this ambiguous phrase without more constitutes substantial evidence to support the conclusion that Snow had knowledge that Kovach and McDonald were engaged, in concert, in an activity protected under the Act.

 For activity to be "concerted" so as to be protected under the labor laws, it must be "inclined to produce group or representative action." *Hugh H. Wilson Corp. v. N. L. R. B.,* 414 F.2d at 1348; *see N. L. R. B. v. Northern Metal Co., supra; Mushroom Transportation Co. v. N. L. R. B., supra.* Therefore, before an employer can be charged with a section 8(a)(1) violation, it must have knowledge, or reason to know, that the employee activities have coalesced into group action for mutual aid or protection. *Hugh H. Wilson Corp. v. N. L. R. B.,* 414 F.2d at 1355. The mere facts that two employees react similarly, and that the one, in empathy with his close friend also decides to do the same thing, does not lead to the conclusion that they are acting "con-

certedly" for the purposes of the Act. Without knowledge of this coalescence, and knowledge that the employees had jointly determined not to work in the absence of premium pay, the employer may justifiably conclude that, although two or more employees act in the same fashion, they are acting individually. The Board has not met its burden of proving that the facts demonstrate the employer's knowledge of concerted activities.

Here, the evidence, even when viewed in the light most favorable to the Board, shows only that Snow knew that McDonald and Kovach were doing the same thing—refusing to work on Saturday without premium pay. Kovach's statement that he was "sticking with" McDonald carried no connotation that the two had banded together for mutual aid or protection or that any sort of representational activity was taking place. Even if this cryptic statement of Kovach's did carry such a connotation, that statement could not overcome the contrary impression, which arises from the "whole record"—that no group action was involved. Therefore, Kovach's statement cannot and does not, by itself, constitute substantial evidence that Tri-State knew that its employees were engaged in a concerted activity. Lacking this knowledge, Tri-State could not have discharged McDonald and Kovach with the illicit motive requisite in section 8(a)(1) violations. *N. L. R. B. v. Brown, supra; Edgewood Nursing Center, Inc. v. N. L. R. B., supra.*

Snow's knowledge that Kovach lived in McDonald's house does not change this result. That the two men occupied the same house and that they both refused to work without premium pay does not necessarily suggest that they were acting in concert as contemplated within the purview of the Act. When viewed against all of the other evidence in the case, none of which contains any suggestion of Tri-State's knowledge of concerted activity, it can hardly be maintained that Snow's mere awareness that

be that McDonald and Kovach were terminated when they indicated, on the telephone, that they would not work on Saturday. They apparently thought they were fired at that time,

and with good reason. T.R. at 20. But evidently Snow would have reinstated them if they subsequently changed their minds and reported to work.

Kovach and McDonald shared common living quarters constitutes evidence sufficient to support the Board's conclusion that Tri-State had knowledge of protected, concerted activity.

## IV.

■ Therefore, we conclude that the two items of evidence upon which the Board relies—Kovach's statement and Snow's knowledge that Kovach and McDonald lived together—do not, in light of the whole record, constitute substantial evidence that Tri-State knew that its employees were engaged in a concerted activity. Rather, the overwhelming import of the record in this case is that Tri-State was not informed, and therefore had no knowledge, of any actions undertaken by its employees for their mutual aid and protection.[6] Accordingly, an essential element for a section 8(a)(1) violation is missing in this case.

In light of the foregoing, we will grant Tri-State's petition to set aside the Board's order of March 19, 1979. The Board's cross-petition for enforcement of its order will be denied.

GIBBONS, Circuit Judge, dissenting.

The petitioner is a small businessman caught in the toils of what many would regard as an overly enthusiastic enforcement of the National Labor Relations Act in a marginal case. Had I been the General Counsel of the National Labor Relations Board I would, I think, have declined to file the charge. Had I been the Administrative Law Judge I might have made different credibility determinations. But I cannot say that the Administrative Law Judge's finding that McDonald and Kovach were discharged for engaging in concerted activity, a finding with which the Board unanimously agreed, lacks evidentiary support in the record as a whole. I can do no better than to quote from Administrative Law Judge Stevensen's opinion:

On either Tuesday or Friday of the week of January 16, President Snow informed the drivers that because deliveries had fallen behind that week, they might be called in to work on Saturday if the weather permitted. No comment was forthcoming from the drivers. On the way home that day, McDonald and Kovach, who lived together, decided they should get time and a half if they were required to work Saturday. That evening the two of them discussed the matter again, agreeing that they would not work Saturday unless they received time and a half pay. They said he would go along with them if the other truckdrivers would. No other drivers were contacted.

Early Saturday morning, January 21, President Snow directed Supervisor Lipovitch to call the drivers and tell them to come to work. McDonald was the first driver called. McDonald asked if he would be paid time and a half, and Lipovitch put Snow on the telephone. McDonald repeated his question, and Snow informed him he had not worked 40 hours that week, and premium pay was paid only after 40 hours. McDonald stated he would not come in unless he was paid time and a half. Snow told him if he refused to come today, he would not be needed Monday or any other time. A short time later, Snow, who was aware that McDonald and Kovach lived together, called Kovach to come to work. Kovach told Snow he was sticking with McDonald and would work only if he was paid time and a half. Snow let Kovach know he would be discharged if he did not work that day. Future possible conduct by either the employees or management was not discussed in either conversation. When Snow telephoned David Howell, Howell said he could not come to work because he was snowed in. McDonald also telephoned Howell, and Ho-

---

6. We note that in other cases where this issue has been raised and where a finding that the employer had knowledge of employees' concerted activity was found to be supportable, the evidence "on the whole record" with respect to such knowledge was much more extensive than in the instant case. See, e. g., N. L. R. B. v. Washington Aluminum Co., 370 U.S. 9, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962); Hugh H. Wilson Corp. v. N. L. R. B., supra.

well told McDonald he was not working either.

Snow waited for McDonald and Kovach most of the morning, thinking they would change their minds and report for work. *When they had not reported by noon, Snow terminated them.* Howell was not terminated because he had what Snow considered an acceptable excuse. The fuel-delivery trucks were driven that day by the drivers who did report supplemented by mechanics and salaried employees.

The facts set forth above establish that employees McDonald and Kovach, who were unrepresented and had no established means of presenting grievances or complaints, engaged in a concerted refusal to work on Saturday, January 21, 1978 because the Respondent would not pay them time and a half for working that day. The record also establishes that the *Respondent, through its knowledge that McDonald and Kovach lived together and Kovach's specifically informing President Snow that he was sticking with McDonald, had reason to believe the two men were acting in concert.* (footnotes omitted) (emphasis added).

The italicized findings establish that President Snow knew, when he terminated McDonald and Kovach at noon on Saturday, that they were engaged in concerted activity with respect to overtime pay. The telephone conversations with McDonald and Kovach on Saturday morning took place, and the Administrative Law Judge believed that Kovach told Snow he was sticking with McDonald. The majority, without the benefit of personal observation of the witnesses, has chosen to do its own factfinding. Our scope of review under the National Labor Relations Act does not permit such action. *See* 29 U.S.C. § 160(e) (1976); *Universal Camera Corp. v. N. L. R. B.*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Thus, while I sympathize with the result, I respectfully dissent.