**FRANK BRISCOE INCORPORATED,**
Petitioner, Cross-Respondent,

v.

**NATIONAL LABOR RELATIONS BOARD,** Respondent,
Cross-Petitioner.

No. 80–1115.

United States Court of Appeals,
Third Circuit.

Argued Oct. 6, 1980.

Decided Jan. 6, 1981.

Carl H. Hellerstedt, Jr., Joseph Mack, III (argued), Thorp, Reed & Armstrong, Pittsburgh, Pa., for petitioner, cross-respondent.

Kenneth B. Hipp, Deputy Asst. Gen. Counsel, Penny Pilzer, Atty. (argued), N. L. R. B., William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D.C., for respondent, cross-petitioner.

* Hon. Murray M. Schwartz, United States District Judge for the District of Delaware, sitting by designation.

1. Under the national agreement with the Union, Briscoe is not required to hire all its workers

Before SEITZ, Chief Judge, HIGGINBOTHAM, Circuit Judge and SCHWARTZ, District Judge *.

## OPINION OF THE COURT

SEITZ, Chief Judge.

Frank Briscoe, Inc. (Briscoe) petitions for review, and the National Labor Relations Board (Board) cross-petitions for enforcement, of an order of the Board. The order of the Board is based on the finding that Briscoe violated section 8(a)(1) of the National Labor Relations Act (NLRA) when it refused to recall certain employees because some of them had engaged in protected, concerted activity by filing charges against Briscoe with the Equal Employment Opportunity Commission (EEOC). *See* 247 NLRB No. 6 (1980). We have jurisdiction under 29 U.S.C. § 160(e) & (f) (1976).

### I.

Briscoe, a New Jersey corporation engaged in general contracting in the construction industry, was the general contractor for the construction of the multi-million dollar convention center in Pittsburgh, Pennsylvania. Briscoe employed between twenty and fifty ironworkers to work on the convention-center project, the number varying according to the working conditions at a given time. Pursuant to Briscoe's national collective bargaining agreement with the International Association of Bridge, Structural and Ornamental Workers (Union), the vast majority of these ironworkers were hired through the Union's hiring hall.[1]

During January and February of 1979, production problems plagued the convention-center project. The entire project was shut down during the second week of February because of poor weather conditions. On February 13, 1979, Ironworker Superintendent Jack Godwin informed Union Steward George Cook that certain workers would have to be laid off.

directly through the hiring hall, it also may accept on-the-job applications. However, since early March 1979, Briscoe has hired primarily through the hiring hall.

Cook, accompanied by the general foreman, then went to a "shanty" where the ironworkers gathered before work. There, he read the names of twelve ironworkers, including Jeffrey, a trainee, who were to be laid off. According to Cook, he was instructed to tell the men that this was a general layoff, and that they would be recalled.

On February 14 and 16, four of the laid-off ironworkers, including Jeffrey, and a fifth ironworker who had been demoted but not laid off, filed charges of racial discrimination with the EEOC. Each of the five complainants is black. Two of these ironworkers filed charges on February 14, and the other three filed charges on February 16. Briscoe received notice of these charges on February 22 and 23.

After the layoff, each of the eight ironworkers involved in this unfair labor practice suit requested, either at the jobsite or at the Union hiring hall, that he be recalled when Briscoe began rehiring. Mr. Hanna, whose testimony the administrative law judge credited, is the Union's business representative in charge of referring workers to jobs from the hiring hall. He testified that temporarily laid-off ironworkers requesting to be recalled normally would be preferentially referred back to the job. However, Mr. Hanna testified that none of the ironworkers laid off on February 13 were referred back to the convention-center jobsite because he had been told by Briscoe's Job Superintendent that Briscoe "didn't intend to hire the men back and . . . as long as [the] discrimination charges [were] filed with the EEOC, if [Briscoe] did take some of the people back, then there would be definite grounds for discrimination." Mr. Hanna informed those ironworkers who requested to be recalled that he would not refer them back to the jobsite, because Briscoe would not recall any of the

workers who had been laid off on February 13 as long as the EEOC charges were pending. According to Mr. Hanna, had it not been for Briscoe's refusal to recall these workers, he would have referred these workers back to the job.

Briscoe began hiring ironworkers again on March 5, hiring twenty-nine workers between that date and April 2. With the sole exception of Jeffrey,[2] none of the ironworkers laid off on February 13 was, or has since been, recalled.

Eight of the workers, including three of the black ironworkers who had filed discrimination charges, brought an unfair labor practice charge against Briscoe for refusing to recall them because some of the workers had filed charges with the EEOC.[3] After conducting the hearing, the administrative law judge found that the black workers who had filed the EEOC charges had engaged in concerted activity protected under section 7 of the NLRA. Further, he found that Briscoe had refused to recall any of the ironworkers laid off on February 13 because some of them had filed EEOC charges. He concluded that this failure to recall the workers violated section 8(a)(1) of the NLRA. The Board affirmed the rulings, findings, and conclusions of the administrative law judge, and adopted his order with one minor modification. Briscoe petitions for review, and the Board cross-petitions for enforcement, of this order.

## II.

First, Briscoe argues that the record does not support the Board's holding that the ironworkers engaged in protected, concerted activity when they filed discrimination charges with the EEOC. Briscoe also argues that the Board erroneously relied on the "constructive concerted activity" doc-

---

**2.** Briscoe explains that Jeffrey was laid off on February 13 because of its mistaken impression that the collective bargaining agreement required that all trainees be laid off before any journeyman could be laid off. When Briscoe realized this mistake, it recalled Jeffrey on February 27.

**3.** Seven of these workers, including two EEOC complainants, filed the unfair labor practice charge on April 20. An eighth worker, who also had filed an EEOC charge, was added to the unfair labor practice complaint at the beginning of the hearing before the administrative law judge.

09

trine enunciated in *Interboro Contractors, Inc.*, 157 N.L.R.B. 1295 (1966), *enforced* 388 F.2d 495 (2d Cir. 1967), which was rejected by this court in *NLRB v. Northern Metal Co.*, 440 F.2d 881 (3d Cir. 1971).

We have consistently held that to qualify as concerted activity, "it must appear at the very least that [the conduct] was engaged in with the object of initiating or inducing or preparing for group action or that it had *some relation to group action in the interest of the employees.*" *Mushroom Transportation Co. v. NLRB*, 330 F.2d 683, 685 (3d Cir. 1964) (emphasis added). Determining whether particular conduct constitutes "concerted activity" is basically a factual inquiry. *See Edward Blankstein, Inc. v. NLRB*, 623 F.2d 320, 321 (3d Cir. 1980). We are bound to uphold the Board's determination if it is supported by substantial evidence on the record as a whole. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); 29 U.S.C. § 160(e) & (f) (1976).

The witnesses who testified before the administrative law judge concentrated on the reasons for Briscoe's refusal to recall the workers laid off on February 13, and thus their testimony is not directed to whether filing the EEOC charges was concerted activity. We believe, however, that the following evidence supports the Board's finding: (1) All five of the EEOC complainants filed charges within three days of the layoff (two of them filed on February 14, and the other three filed on February 16); (2) these complaints are similar in nature; (3) the complaints filed by the two trainees who had been laid off referred to discrimination against other trainees, and a third complaint alleged that the complainant had previously complained that Briscoe discriminated against blacks by not hiring enough trainees, thus indicating that the individual complainants intended to benefit workers other than themselves. *Compare Wheeling-Pittsburgh Steel Corp. v. NLRB*, 618 F.2d 1009 (3d Cir. 1980) (employee refusing to work because unsafe conditions endangered

not only himself but also other employees engaging in concerted activity) *with Northern Metal Co.*, 440 F.2d 881 (employee attempting to secure holiday pay only for himself not engaging in concerted activity).

Further, the testimony before the administrative law judge contains ample evidence that Briscoe lumped the charges together and viewed "the blacks" as a group with respect to those charges. The evidence that Briscoe clearly knew of the EEOC charges and viewed the complainants as a group distinguishes this case from *Tri-State Truck Service v. NLRB*, 616 F.2d 65, 71 (3d Cir. 1980) (employer "must have knowledge, or reason to know, that employee activities have coalesced into group action for mutual aid or protection"). After reviewing the record, we are satisfied that there is substantial evidence on the record as a whole to support the Board's determination that the ironworkers engaged in concerted activity by filing the EEOC charges.

Briscoe's argument that the Board impermissibly relied on the *Interboro* doctrine[4] by adopting the findings of the administrative law judge does not alter our conclusion. Although the administrative law judge cited *Interboro*, he did so in a footnote in which he correctly rejected Briscoe's contention that filing EEOC charges could benefit only other black workers because success could come only at the expense of the white workers. Further, *Interboro* was one of five cases cited by the administrative law judge in this footnote, and three of the other cases involved facts showing traditional concerted activity. Therefore, given the context of the reference to *Interboro* and the other cases cited, we are satisfied that the Board's finding of concerted activity is not based on the "constructive concerted activity" doctrine of *Interboro*.

Having found that substantial evidence supports the Board's conclusion that filing the EEOC charges constituted concerted activity, we must examine the Board's conclusion that this activity was

4. On appeal, the Board disavows any reliance on *Interboro*, and concedes that *Mushroom*

*Transportation Co.* controls the question whether there was concerted activity.

protected under section 7. In order to be protected under section 7, the concerted activity must be "for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157 (1976). Activities relating to conditions of employment are for "mutual aid or protection." We conclude that concerted activity directed toward ending alleged discriminatory employment practices falls within this standard, and thus deserves protection under section 7, at least as long as it does not violate another important principle of labor law, such as the principle of exclusive representation. *See, e. g., Emporium Capwell Co. v. Western Addition Community Organization,* 420 U.S. 50, 70, 95 S.Ct. 977, 988, 43 L.Ed.2d 12 (1975) (national labor policy embodying principles of nondiscrimination does not require an exception to the exclusivity principles of section 9(a)); *United Packinghouse Workers v. NLRB,* 416 F.2d 1126, 1135 (D.C. Cir.) ("racially integrated working conditions are valid objects for employee action"), *cert. denied sub nom., Farmers' Cooperative Compress v. United Packinghouse Workers,* 396 U.S. 903, 90 S.Ct. 216, 24 L.Ed.2d 179 (1969). The record amply supports the conclusion that the EEOC complainants, by seeking to end Briscoe's alleged discriminatory practices against other workers as well as against themselves, were acting for "mutual aid or protection," and thus were protected under section 7.[5]

### III.

■ Next, Briscoe argues that the evidence on the record does not support the Board's finding that Briscoe refused to recall the ironworkers because some of them had filed EEOC charges. After reviewing the testimony presented to the administrative law judge, we are satisfied that substantial evidence supports the finding that Briscoe intended the February 13th layoff to be a temporary cutback because of poor weather, and that it later refused to recall the workers because of the pending EEOC charges. There was ample testimony that the weather at the time of the layoff was extremely poor; that Briscoe told Cook, the Union steward, to tell the laid-off workers that the layoff was temporary and that they would be recalled; and that Mr. Hanna, as well as the workers themselves, believed that the layoff was temporary. In fact, Briscoe's Job Superintendent admitted to the administrative law judge that he had represented to the Pennsylvania unemployment insurance authorities that the employees were laid off because of lack of work and not for cause. There was also ample testimony that Briscoe had informed Mr. Hanna, as well as some of the white workers laid off on February 13, that Briscoe would not recall any of the laid-off workers as long as the charges were pending, and that Briscoe could not recall any of the white workers because, if it did, then it would have to recall the blacks who had filed the EEOC charges.

Moreover, a review of the record does not indicate that the evidence in support of the Board's finding is "overborne by evidence calling for contrary inferences." *NLRB v. Pittsburgh Steamship Co.,* 340 U.S. 498, 502, 71 S.Ct. 453, 455, 95 L.Ed. 479 (1951). The job-performance records that Briscoe sought to admit at the hearing to demonstrate poor work performance did not chart the performance of individual ironworkers, but only charted the performance of the four crews. Moreover, the workers who

---

5. Briscoe also argues that, by relying on the "presumption" of concerted activity derived from the *Interboro* line of cases, the Board erroneously shifted the burden of proof and required Briscoe to demonstrate the reason for its initial decision to lay off the workers, which will be the issue in each of the EEOC charges. Briscoe thus appears to be arguing that the Board forced it to try the EEOC charges in an unfair labor practice proceeding. We disagree. Any shifting of the burden was not the result of this alleged presumption, but was the result of the Board's demonstrating that Briscoe had retaliated against the protected, concerted activity engaged in by these workers. Any duplication in what Briscoe will try to prove in the EEOC and the Board proceedings derives not from any attempt on the Board's part to try an EEOC charge, but from the fact that Briscoe's alleged nonretaliatory reason for not rehiring the workers, *i. e.* that they were poor performers, necessarily implicates the reason for the original layoff.

were laid off on February 13 did not all come from one crew. Thus, the job-performance records do not support Briscoe's contention that the ironworkers were laid off because they were poor workers. Therefore, we conclude that the finding of the Board, that Briscoe refused to recall the workers because some of them had engaged in protected, concerted activity by filing EEOC charges, is fully supported on the record.

### IV.

 Finally, Briscoe argues that the only remedy available to the workers for Briscoe's refusal to rehire them is section 704(a) of title VII, 42 U.S.C. § 2000e–3(a) (1976) (prohibiting retaliation by an employer when an employee has opposed the employer's discriminatory practices or has participated in any title VII proceeding). We cannot determine whether Briscoe is arguing that the Board erred in finding that filing the EEOC charges was concerted activity protected under section 7, and thus that section 8(a)(1) of the NLRA was not implicated, or that section 704(a) of title VII is the exclusive remedy for retaliation against employees who oppose employer discrimination regardless of whether such opposition may also constitute concerted activity protected under section 7. We have already addressed and rejected the contentions that filing the EEOC charges was not concerted, protected activity, and that the Board erroneously relied on the "constructive concerted activity" doctrine enunciated in *Interboro Contractors, Inc.*, 157 N.L.R.B. 1295, *enforced* 388 F.2d 495 (2d Cir. 1967). Thus, we will enforce the order of the Board unless section 704(a) of title VII provides the exclusive remedy for the ironworkers here involved.

Nothing in the text of title VII itself addresses the relation between section 704(a) and section 8(a)(1). However, the legislative history of title VII demonstrates that Congress intended to allow an individual to pursue rights independently under both title VII and other applicable statutes, including the NLRA. For example, in re-

sponse to a suggestion that title VII would adversely affect rights under the labor laws, Senator Clark, one of the sponsors of the bill, introduced an interpretative memorandum that states:

"Nothing in title VII or anywhere else in this bill affects rights and obligations under the NLRA and the Railway Labor Act. The procedures set up in title VII are the exclusive means of relief against those practices of discrimination which are forbidden as unlawful employment practices by sections 704 and 705. *Of course, title VII is not intended to, and does not deny to any individual, rights and remedies which he may pursue under other Federal and State statutes. If a given action should violate both title VII and the [NLRA], the [Board] would not be deprived of jurisdiction....* [T]itle VII would have no effect on the duties of any employer or labor organization ..., and these duties would continue to be enforced as they are now."

110 Cong.Rec. 7207 (1964) (emphasis added). In addition, the Senate defeated an amendment that would have made title VII the exclusive federal remedy for most unlawful employment practices. *See* 110 Cong.Rec. 13,650–52 (1964). Further when the Equal Employment Opportunity Act of 1972 (EEOA) was enacted, a similar amendment was rejected. *See* H.R.Rep.No.92–238, 92d Cong., 1st Sess. 66 (1971) U.S.Code Cong. & Admin.News 1972, p. 2137 (minority views on H.R. 1746) ("charges of discrimination in employment conditions may still be brought under the [NLRA];" "our attempt ... to make title VII an exclusive remedy ... was rejected"). The Senate Committee Report on the EEOA provides that neither the "provisions regarding the individual's right to sue under title VII, nor any of the other provisions of this bill, are meant to affect existing rights granted under other laws." S.Rep.No.92–415, 92d Cong., 1st Sess. 24 (1971). Thus, the legislative history demonstrates that title VII was intended to supplement, not replace, existing methods of combatting employment discrimination. *See, e. g., Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 48–49, 94 S.Ct. 1011, 1019–20,

39 L.Ed.2d 147 (1974); *United Packinghouse Workers v. NLRB*, 416 F.2d 1126, 1133–34 n.11 (D.C.Cir.), *cert. denied sub nom., Farmers' Cooperative Compress v. United Packinghouse Workers*, 396 U.S. 903, 90 S.Ct. 216, (1969).

Moreover, judicial interpretation of both title VII and the NLRA supports the conclusion that certain conduct may be protected by both statutes, and thus an employee may resort to the remedies of either statute. For example, in *Eastex, Inc. v. NLRB*, 437 U.S. 556, 565–66, 98 S.Ct. 2505, 2512–13, 57 L.Ed.2d 428 (1978), the Supreme Court noted that the " 'mutual protection' clause [of section 7] protects employees from retaliation by their employers when they seek to improve working conditions through resort to administrative and judicial forums." The Court then cited with approval several Board cases, including *King Soopers, Inc.*, 222 N.L.R.B. No. 80, 1975–76 N.L.R.B. Dec. (CCH) ¶ 16,631 (1976), in which the Board held that filing EEOC charges was protected, concerted activity, and that section 704(a) did not provide the exclusive remedy for retaliation. *See* 437 U.S. at 566 n.15, 98 S.Ct. at 2512 n.15 (not addressing question of what may constitute concerted activity). *See also Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (holding that an employee pursuing a grievance concerning racial discrimination to final arbitration does not forfeit his private cause of action under title VII); *Young v. IT&T*, 438 F.2d 757, 762 (3d Cir. 1971); *United Packinghouse Workers*, 416 F.2d 1126. We conclude that, when the Board finds that the conduct of employees constitutes concerted activity protected under section 7, and that the employer has refused to recall a group of employees because some of them were exercising these section 7 rights, the fact that some of the employees [6] also have a remedy under section 704(a) does not deprive the Board of jurisdiction.

We do not believe that the holding of the Supreme Court in *Great American Federal Savings & Loan Association v. Novotny*, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979), is inconsistent with our conclusion. In *Novotny*, the Court did not consider whether title VII provides the exclusive remedy when the same factual occurrence gives rise to violations of "two 'independent' rights," *id.* at 378, 99 S.Ct. at 2352, which is the issue we address in this case. Instead, the Court held "that § 1985(c) may not be invoked to redress violations of Title VII." *Id.* Nor do we believe that the Court's holding in *Emporium Capwell Co. v. Western Addition Community Organization*, 420 U.S. 50, 70, 95 S.Ct. 977, 988, 43 L.Ed.2d 12 (1975), supports Briscoe's suggestion that section 704(a) should be the exclusive remedy even when the employees' conduct is also protected by section 7 of the NLRA. On the contrary, we believe that *Emporium Capwell* supports our conclusion that section 8(a)(1) protects employees from employer retaliation for engaging in protected, concerted activity even when section 704(a) also provides protection. In *Emporium Capwell*, the Court held that the national labor policy of nondiscrimination did not protect the decision of a group of minority employees to bypass the grievance procedures of the collective bargaining agreement in favor of attempting to bargain directly with the employer in derogation of the exclusivity principles of section 9(a) of the NLRA. In reaching this conclusion, the Court recognized that "national labor policy embodies the principle of nondiscrimination as a matter of highest priority." *Id.* at 66, 95 S.Ct. at 986. Moreover, in rejecting the contention that to further this policy an exception should be made to the exclusivity principle, the Court reasoned:

This argument confuses the employees' substantive right to be free of racial dis-

---

**6.** Although Briscoe argues that § 704(a) is the exclusive remedy for all the ironworkers laid off on February 13, it never addresses whether those ironworkers who did not file EEOC charges would have a remedy under title VII. The record does not disclose whether they also "opposed" Briscoe's alleged racial discrimina-

tion and thus would be protected from retaliation by § 704(a). Because we reject Briscoe's contention that § 704(a) provides the exclusive remedy for an employer's retaliatory conduct that also violates § 8(a)(1), we need not address this issue.

crimination with the *procedures available under the NLRA for securing these rights.* Whether they are thought to depend upon Title VII or *to have an independent source in the NLRA,*[23] they cannot be pursued at the expense of the orderly collective-bargaining process contemplated by the NLRA.

*Id.* at 69, 95 S.Ct. at 988 (emphasis added) (in footnote 23, the Court cited *United Packinghouse Workers,* 416 F.2d 1126, which held that racially integrated working conditions are valid objects for employee action protected under the NLRA, and that title VII does not provide the exclusive remedy for employment discrimination).

Finally, we emphasize that we are not holding that all conduct protected by section 704(a) is necessarily protected by section 8(a)(1). As the Supreme Court stated in *Emporium Capwell,* even if section 704(a) protects the employees' conduct, "the same conduct is *not necessarily entitled to affirmative protection from the NLRA.*" 420 U.S. at 71–72, 95 S.Ct. at 989 (emphasis added). On the other hand, when employees engage in concerted activity for mutual aid and protection, which ordinarily would be protected by the NLRA, the mere fact that this concerted conduct was manifested in the form of filing EEOC complaints does not convert the employees' complaint under the NLRA into one exclusively under title VII. Therefore, we hold only that where employees engage in concerted activity protected under section 7, the fact that such conduct also may be protected from retaliation by section 704(a) does not deprive the NLRB of jurisdiction.

1. The collective bargaining agreement is not part of the record in this case. At oral argument all counsel agreed this Court would have to treat the matter as it was handled before the Board, i. e., as concerted activity falling within the "mutual aid or protection" language of section 7 rather than the "collective bargaining" language of the same section. If there were an anti-discrimination clause in the collective bargaining agreement, Briscoe and the union would have arguably conferred jurisdiction upon the NLRB. *See Electrical, Radio, and*

## V.

We conclude that there is substantial evidence on the record to support the finding of the Board that the workers, by filing the EEOC charges, engaged in concerted activity protected by section 7. We also conclude that substantial evidence supports the finding of the Board that Briscoe intended the February 13 layoff to be temporary, and subsequently did not recall the workers because some of them had filed EEOC charges, thus violating section 8(a)(1) of the NLRA. Further, we find that the Board was not deprived of jurisdiction to remedy Briscoe's retaliation against the workers for exercising their section 7 rights merely because the workers who had filed the charges also could pursue a remedy under section 704(a).

## VI.

Briscoe's petition for review of the order of the Board will be denied. The Board's cross-petition for enforcement of the order of the Board will be granted.

MURRAY M. SCHWARTZ, District Judge, dissenting.

I concur in two of the majority's conclusions: 1) that there is substantial evidence in the record to support the Board's finding that Briscoe in refusing to rehire the laid-off ironworkers retaliated against all of them because some had filed EEOC charges; and 2) that filing the charges was "concerted activit[y] . . . for mutual aid or protection. . . ."[1] I part company with the majority when it assumes that such activity is *protected* concerted activity "under Section 7 [of the National Labor Relations Act ("the Act"), 29 U.S.C. § 157],[2] at least as

*Machine Workers v. NLRB,* 49 U.S.L.W. 2388 (D.C.Cir. Nov. 28, 1980). That question and another posed by the majority at its note 6 are not before this panel.

2. Section 7 reads in pertinent part:
 Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection. . . .

954

long as it does not violate another important principle of labor law...." (Majority opinion p. 950).

In the instant matter Briscoe is charged with commission of an unfair labor practice under section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1),[3] in that it retaliated against laid-off employees by refusal to rehire because some of their number filed charges with the EEOC. In *Emporium Capwell Co. v. Western Addition Community Organization*, 420 U.S. 50, 95 S.Ct. 977, 43 L.Ed.2d 12 (1975), the employer was charged with an unfair labor practice under section 8(a)(1) by reason of its retaliatory firing of picketing employees. In that case the employees were assumed to be engaged in concerted activity for the purpose of collective bargaining over issues of employment discrimination. The Supreme Court did not automatically assume the activity was protected. Instead it posed the issue as whether "in light of the national policy against racial discrimination in employment, the National Labor Relations Act protects concerted activity by a group of minority employees to bargain with their employer over issues of employment discrimination." *Id.* at 52. Similarly, in the instant matter, the question this Court must answer is whether Congress intended that the National Labor Relations Act protect concerted activity by a group of minority employees who file charges with the EEOC when Congress expressly allocated adjustment of retaliation claims under Title VII to the EEOC.[4] The majority has answered the question in the affirmative. This separate opinion arises from the belief that this Court should not permit the NLRB to arrogate to itself power Congress has placed elsewhere.

**3.** Section 8(a)(1) provides:
(a) It shall be an unfair labor practice for an employer—
(1) To interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

**4.** Section 704(a) of Title VII, 42 U.S.C. § 2000e–3(a), provides in pertinent part:
It shall be an unlawful employment practice for an employer ... to discriminate

In recent years the Supreme Court has expressed considerable concern that employment discrimination matters be addressed in the appropriate forum. *See NAACP v. Federal Power Commission*, 425 U.S. 662, 96 S.Ct. 1806, 48 L.Ed.2d 284 (1976); *Emporium Capwell Co. v. Western Addition Community Organization*, 420 U.S. 50, 95 S.Ct. 977, 43 L.Ed.2d 12 (1975); *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974); *see also International Union of Electrical, Radio & Machine Workers, Local 790 v. Robbins & Myers, Inc.*, 429 U.S. 229, 97 S.Ct. 441, 50 L.Ed.2d 427 (1976). It has demonstrated the same concern in assuring that Title VII is not used as a substantive ground for finding violations of other statutes.[5] *See Great American Federal Savings & Loan Association v. Novotny*, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979); *Emporium Capwell Co. v. Western Addition Community Organization, supra.*

Notwithstanding Supreme Court concern, the question of whether Congress intended to give jurisdiction to both the EEOC and NLRB when there is employer retaliation due to the filing of EEOC complaints is one of first impression at the appellate court level. Included within this question are two important sub-issues: allocation of jurisdiction between two governmental agencies and whether an unfair employment practice, a substantive right created by Title VII, can be remedied by the NLRB under the guise of an unfair labor practice. A broad overview of the legislative history of the Title VII and the NLRA, an unwillingness to conclude that Congress intended two administrative agencies to have separate jurisdiction over the same act of employment discrimination, and controlling case law lead to the conclusion that the majority result is unacceptable.

against any individual ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

**5.** See *infra* pp. 956–957.

Careful scrutiny of the legislative history of Title VII cited in the majority's able opinion reveals it is of no aid. The issue before the Court is whether employer retaliation for filing charges with the EEOC is within the jurisdiction of the NLRB. Thus, any argument that passage of Title VII was not intended to strip the NLRB of whatever statutory authority it had over employment discrimination prior .to passage of Title VII does not advance the inquiry.[6] The focus of this Court is narrow: whether a newly created unfair employment ·practice which did not and could not exist prior to passage of Title VII and for which a remedy was specifically provided in Title VII is also an unfair labor practice[7] under the NLRA.

Conversely, the legislative history of the National Labor Relations Act conclusively demonstrates that Congress did not intend for the NLRB to have an active civil rights role. *See generally* Axelrod and Kaufman, *Mansion House—Bekins—Handy Andy: The National Labor Relations Board's Role in Racial Discrimination Cases,* 45 Geo. Wash.L.Rev. 675, 682–88 (1977). When the Wagner Act of 1935 was debated, Congress paid scant attention to civil rights problems and summarily rejected concerns of the National Association for Advancement of Colored People and National Urban League. When Congress passed the Taft-Hartley Act,[8] it added prohibitions of certain union practices, but expressly rejected efforts to insert prohibitions aimed at remedying employment discrimination. Finally, when Congress considered the Landrum-Griffin Act,[9] which regulated internal union affairs, it rejected an amendment aimed at union discriminatory policies. 105 Cong. Rec. 15722–24 (1959).

Congress did not act to eliminate employment discrimination until 1964 when it passed Title VII. Responsibility for eradicating employment discrimination could have been lodged in the NLRB. Instead, a new Commission, the EEOC, was born. Similarly, Congress could have provided the EEOC with statutory implementation machinery like that of the NLRB. It did not. Political compromise resulted in an enforcement mechanism for Title VII vastly different from that of the NLRA.

Under Title VII

[a]nyone aggrieved by employment discrimination may lodge a charge with the EEOC. That commission is vested with the 'authority to investigate individual charges of discrimination, to promote voluntary compliance with the requirements of Title VII, and to institute civil actions against employers or unions named in the discrimination charge.' Thus, the Commission itself may institute a civil action. If, however, the EEOC is not successful in obtaining 'voluntary compliance' and, for one reason or another, chooses not to sue on the claimant's behalf, the claimant ... may demand a right-to-sue letter and institute the Title VII action himself without waiting for the completion of the conciliation procedures.

In the claimant's suit, the federal district court is empowered to appoint counsel for him, to authorize the commencement of the action without payment of fees, costs, or security, and even to allow an attorney's fee. Where intentional engagement in unlawful discrimination is proved, the court may award backpay and

---

**6.** The Title VII legislative history cited by the majority supports the proposition that passage of Title VII did not contract the jurisdiction of the NLRB, but does not address the issue confronting this panel—whether a newly created statutory right under Title VII should be a basis for an unfair labor practice charge. This is best illustrated by the language immediately preceding the excerpt from the interpretive Memorandum of Senator Clark cited in the majority opinion (Majority op. at p. 951). The missing language reads:

it has been asserted that it would be possible to deny unions their representation rights under the National Labor Relations Act and the Railway Labor Act. This is not correct. *110 Cong.Rec. 7207 (1964).*

**7.** See note 1 *supra.*

**8.** Labor Management Relations Act of 1947, 61 Stat. 136 (1947).

**9.** Labor-Management Reporting and Disclosure Act of 1959, 73 Stat. 519 (1959).

order 'such affirmative action as may be appropriate.'

*Johnson v. Railway Express Agency, supra,* 421 U.S. 454, 458, 95 S.Ct. 1716, 1719, 44 L.Ed.2d 295 (1975). [citations omitted]. Thus, under Title VII the emphasis is on individual rights, conciliation and, if unsuccessful, filing of a law suit in the federal district court. "By contrast, once the General Counsel of the NLRB decides to issue a complaint, vindication of the charging party's statutory rights becomes a public function discharged at public expense, and a favorable decision by the Board brings forth an administrative order." *Emporium Capwell Co. v. Western Addition Community Organization, supra,* 420 U.S. at 72, 95 S.Ct. at 989.

The enforcement philosophies and mechanisms of the two statutes as recited above cannot be reconciled. Filing of an unfair labor charge will be an impediment to successful conciliation, irrespective of who prevails. Can we seriously attribute to Congress an intent to have the parties take part in the conciliation process at the same time they are engaged in an adversarial proceeding before the Board? Further, unless Congress explicitly so states, it is singularly inappropriate to attribute to that body an intent that an employer should be forced to appear before two administrative agencies for the same alleged act of employment discrimination. Implicit in the majority's holding is that Congress intended to apply inconsistent enforcement philosophies and irreconcilable statutory enforcement schema to the same episode of employment discrimination in instances where the same is not expressly covered in the NLRA. This untenable result is even more difficult to accept when it is remembered that the two statutes have completely different objectives. The NLRA seeks to minimize industrial strife by guaranteeing employees the most basic "collective rights" of industrial self-determination by " 'encouraging the practice and procedure of collective bargaining' " through majoritarian rule and the principle of exclusive representation *Emporium Capwell, supra,* 420 U.S. at 62, 95 S.Ct. at 984, *quoting* 29 U.S.C. § 151. Title VII, on the other hand, seeks to eradicate employment discrimination through exercise of rights by individual claimants.

On two occasions the Supreme Court has answered in the negative the question whether the substantive rights conferred by Title VII may be used as the basis for relief under other statutes. In *Great American Federal Savings & Loan Association v. Novotny,* reversing this unanimous *en banc* court, it stated: "The right Novotny claims under section 704(a) did not even arguably exist before the passage of Title VII. The only question here, therefore, is whether the rights created by Title VII may be asserted within the *remedial* framework of § 1985(c)." 442 U.S. at 376–77, 99 S.Ct. at 2351. While preserving independently based rights, whether the same be contractual, *see Alexander v. Gardner-Denver Co., supra; International Union of Electrical, Radio & Machine Workers, Local 790 v. Robbins & Myers, Inc., supra,* or statutory, *see Johnson v. Railway Express Agency, supra,* the Supreme Court forbade suit under section 1985(c). In *Emporium Capwell,* the contention was made that the "congressional policy of protecting from employer reprisal employee efforts to oppose unlawful discrimination, as expressed in § 704(a) of Title VII" had to be a violation of section 8(a)(1)[10] of the NLRA or "the integrity of § 704(a) will be seriously undermined." 420 U.S. at 71, 95 S.Ct. at 989. The Supreme Court expressly rejected this invitation to make the substantive rights of Title VII a basis for an unfair labor practice charge stating that rights entitled to protection under section 704(a) of Title VII are "not necessarily entitled to affirmative protection from the NLRA." *Id.* at 71–72, 95 S.Ct. at 989–990.

The *Emporium Capwell* opinion also answered in the most direct language possible the issue that necessitates this dissent.

---

**10.** While the emphasis throughout has been on Section 7 of the NLRA, Briscoe was charged with a violation of section 8(a)(1) which by its terms makes any concerted activity protected by section 7 an unfair labor practice. See notes 2 and 3, *supra.*

*"Questions arising under Title VII must be resolved by the means that Congress provided for that purpose. . . .* What is said above does not call into question either the capacity or the propriety of the Board's sensitivity to questions of discrimination. *It pertains, rather, to the proper allocation of a particular function—adjudication of claimed violations of Title VII—that Congress has assigned elsewhere."* *Id.* at 71, n.25, 95 S.Ct. at 989 n.25 [emphasis added]. The concluding language of the *Emporium Capwell* majority has gone unheeded by this panel's majority.

> In order to hold that employer conduct violates § 8(a)(1) of the NLRA *because* it violates § 704(a) of Title VII, we would have to override a host of consciously made decisions well within the exclusive competence of the Legislature. This obviously, we cannot do.

*Id.* at 73, 95 S.Ct. at 990 [footnote omitted]. Given that the NLRA and Title VII have diverse objectives and vastly different enforcement philosophies and mechanisms for adjustment, it can be confidently predicted that today's decision will eventually involve this Court in conceptual difficulties which will only be resolved by a broad based retreat.

In summary, because the decision of the majority does violence to an overall view of the legislative history of the NLRA and Title VII, attributes to Congress the intent to expose an employer to two administrative agencies with conflicting statutory philosophies and mechanics of enforcement for the same unfair employment practice, and does not give the necessary fealty to the holdings of *Emporium Capwell Co. v. Western Addition Community Organization, supra,* and *Great American Federal Savings & Loan Association v. Novotny, supra.* I respectfully dissent.